**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACCELERANT SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>SECOND NATURE BRANDS, INC.; and SECOND NATURE INSURANCE SERVICES, LLC;<br><br>Defendants. | Case No.: 1:24-cv-03558-JMC |

**DECLARATION OF BONNIE THOMPSON IN SUPPORT OF ACCELERANT SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Bonnie Thompson being duly sworn, deposes and states as follows:

1. I am Of Counsel in the law firm of Lavin Rindner Duffield LLC, counsel for Plaintiff Accelerant Specialty Insurance Company ("Accelerant") in the above-captioned case. I have personal knowledge of the facts stated in this declaration, and if called as a witness could and would testify to these facts.

2. I submit this declaration in support of Accelerant's Motion for Summary Judgment and Memorandum of Points and Authorities in Support.

3. Attached as Exhibit 1 is a true and correct copy of Professional Liability Policy No. S0004PL00191000 (the "Policy"), issued to Second Nature Brands, Inc. ("Second Nature Brands") for the **policy period** of May 2, 2023 to July 1, 2024.

4. Attached as Exhibit 2 is a true and correct copy of the First Amended Complaint filed in *Best, et al. v. Second Nature Brands, Inc. et al.*, Case No. 1:24-cv-01799 (D.D.C.) (the "*Best* Action") on September 13, 2024.

5. Attached as Exhibit 3 is a true and correct copy of the July 8, 2024 coverage

correspondence from Accelerant to Second Nature.

6. Attached as Exhibit 4 is a true and correct copy of the August 30, 2024 letter from Second Nature to Accelerant.

7. Attached as Exhibit 5 is a true and correct copy of the September 25, 2024 coverage correspondence from Accelerant to Second Nature.

1. I declare under penalty of perjury that the foregoing is true and correct. Executed on September 15, 2025.



Bonnie J. Thompson

# Exhibit 1

ACCELERANT

# ACCELERANT SPECIALTY INSURANCE COMPANY
# (A Stock Company)

## Professional Liability Policy

**DECLARATIONS**

**NOTICE: YOUR POLICY CONTAINS CLAIMS-MADE LIABILITY COVERAGE. CLAIMS-MADE COVERAGE APPLIES ONLY TO CLAIMS THAT ARE FIRST MADE AND REPORTED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF PURCHASED.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES MAY BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES. FURTHERMORE, CLAIMS EXPENSES WILL BE APPLIED AGAINST THE RETENTION.**

**PLEASE READ YOUR POLICY CAREFULLY AND CONSULT YOUR INSURANCE ADVISOR ABOUT ANY QUESTIONS YOU MIGHT HAVE.**

**Policy No.:** S0004PL00191000 **Renewal of:**

1. **Name Insured:** Second Nature Brands, Inc
   **Address:** 333 FAYETTEVILLE ST
   RALEIGH, NC 27601

2. **Policy Period:** **Inception Date:** 05/02/2023 **Expiration Date:** 07/01/2024
   Inception date shown shall be at 12:01 A.M. (Standard Time) to Expiration date shown above at 12:01 A.M. (Standard Time) at the address of the Named Insured.

3. **Limits of Liability**

| | | | | |
|---|---|---|---|---|
| **A.** | **Professional Liability (PL)** | $1,000,000 | **Each Claim** | |
| | | $1,000,000 | **Aggregate** | |
| **B.** | **Contingent Bodily Injury/Property Damage** | $50,000 | **Aggregate** | **Shared with PL** |
| **C.** | **Copyright Infringement** | $25,000 | **Aggregate** | **Shared with PL** |
| **D.** | **Crisis Management Event** | $50,000 | **Aggregate** | **Separate Limit** |
| **E.** | **Disciplinary and Licensing Proceedings Defense** | $25,000 | **Aggregate** | **Separate Limit** |
| **F.** | **Subpoena Assistance** | $25,000 | **Aggregate** | **Separate Limit** |
| **G.** | **Third Party Discrimination** | $50,000 | **Aggregate** | **Shared with PL** |

4. **Retention:** $10,000 **Per Claim** / N/A **Aggregate**

5. **Retroactive Date:** 05/02/2023

**6. Policy Premium:** [redacted]
**Policy Fee:**
**Total:**

**7. Option Extended Reporting Period:**

| | |
|---|---|
| **One (1) Year:** | 100% |
| **Two (2) Years:** | 150% |
| **Three (3) Years:** | 185% |

**8. Send Notification of Claims or Circumstances to:**

Premium Claims Management, LLC
2020B N Tustin Ave
Santa Ana, CA 92705
claims@premierclaimsllc.com
Tel: 888-683-2266
Tel: 866-885-4047

**9. Professional Service(s):**

Residents' concierge services

**IN WITNESS WHEREOF, the Insurer indicated above has caused this Policy to be signed by its Chief Underwriting Officer, but this Policy shall not be effective unless also signed by the Insurer's duly authorized representative.**



**Chief Underwriting Officer**

# POLICY FORMS DECLARATIONS

| Form Number | Form Date | Form Description |
|---|---|---|
| S PL 50001 | 01/23 | Professional Liability Insurance |
| IL P 001 | 01/04 | OFAC Notice |
| S PL 50044 | 09/20 | Service of Suits |
| S PL 50052 | 01/21 | Claims Notice Address Endorsement |
| S PL 50059 | 01/21 | Nuclear Incident Exclusion (Broad Form) Endorsement |
| S PL 50081 | 02/21 | Personal Concierge Services Endorsement |
| S PL 50104 | 04/21 | General Liability Requirement Endorsement (Limited) |
| S PL 50051 | 01/21 | Claims Expenses Within the Limits Endorsement |
| S PL 50047 | 01/21 | Additional Exclusion Endorsement |

ACCELERANT

# ACCELERANT SPECIALTY INSURANCE COMPANY
# (A Stock Company)

## «PolicyName»

In consideration of the premium charged, and in reliance on the statements made and information provided to **us**, **we** will pay covered amounts as defined in this policy, provided **you** properly notify **us** of claims and meet **your** obligations to **us** in accordance with the terms of this policy.

## I. Who are the parties to this policy

**A.** The Insurer identified on the Declarations as issuing this policy. When used in this policy, the terms **us**, **we** and **our** refers to the Insurer identified on the Declarations as issuing this policy, and

**B.** An **Insured**. When used in this policy, the terms **you** and **your**, also refers to an **insured.**

## II. The Insuring Agreement - Our promise to you

**We** will pay up to the **per claim limit** for **damages** and **claim expenses** in excess of the **retention** for covered **claims** against **you** alleging a negligent act, error, or omission in **your professional services** performed on or after the **retroactive date** provided the **claim** is first made against **you** during the **policy period** and is reported to **us** in accordance with Section **V. Your** obligations.

## III. Coverage Enhancements

**We** will also make the following payments:

**A. Contingent Bodily Injury/Property Damage**

**We** will pay **damages** and **claim expenses** up to the limit stated in **3.B** of the Declarations for any **claim** against **you** for **bodily injury** or **property damage** provided:

1. The **claim** is first made against **you** during the **policy period**,
2. It directly results from **your professional services** performed on or after the **retroactive date,**
3. It is reported to **us** in accordance with Section V. **Your** obligations, and
4. Any **property damage** is not to goods that are in **your** care, custody, or control.

**You** must pay the **retention** stated in the Declarations in connection with any payment **we** make under this subsection **A**. This limit will be part of and not in addition to the limit of liability stated in **3.A.** of the Declarations.

**B. Copyright Infringement**

**We** will pay **damages** and **claim expenses** up to the limit stated in **3.C** of the Declarations for any **infringement claim** against **you,** provided the **claim** is first made against **you** during the **policy period**, it directly results from **your professional services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section **V. Your** obligations.

**You** must pay the **retention** stated in the Declarations in connection with any payment **we** make under this subsection **B.** This limit will be part of and not in addition to the limit of liability stated in **3.A.** of the Declarations.

**C. Crisis Management**

**We** will pay up to up to the limit stated in **3.D** of the Declarations, in the aggregate, for the reasonable and necessary fees, costs, and expenses b incur with **our** prior written consent for a public relations firm to assist **you** in responding to a **crisis management event**, provided the **crisis management event** occurs during the **policy period** and it is reported to **us** in accordance with Section V. **Your** obligations.

No retention will apply to amounts **we** pay under this Section **C**. and such amounts will be in addition to, and not part of, the Aggregate Limit.

**D. Disciplinary and Licensing Proceedings**

**We** will pay up to the limit stated in **3.E** of the Declarations for the reasonable and necessary fees, costs, and expenses incurred with **our** prior consent in the investigation, defense, or appeal of any state, federal, or other licensing board inquiry or proceeding concerning **your** eligibility or license to engage in **your professional services**, provided **you** first receive notice of such inquiry or proceeding during the **policy period**, it relates to **your professional services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section V. **Your** obligations.

No **retention** will apply to amounts **we** pay under this subsection **D**, and such amounts will be in addition to, and not part of, the Aggregate Limit.

**E. Pre-Claims Assistance Coverage**

**We** will pay reasonable and necessary fees, costs, and expenses we incur to investigate or monitor a potential claim that is reasonable likely to result in covered **damages**, provided **you** first become aware of such potential claim during the **policy period**, it relates to **your** performance of **professional services** on or after the **retroactive date**, and it is reported to **us** in accordance with Section **V. Your** obligations.

**Our** obligation to make any payments under this Section will cease when a **claim** is made against **you** arising out of the same circumstances as the potential **claim we** investigated or monitored.

No retention will apply to amounts **we** pay under this Section until such potential **claim** becomes an actual **claim**, at which point the **retention** will apply. Any payments **we** make under this Section will be a part of, and not in addition to, Aggregate Limit.

**F. Supplemental Payments**

**We** will pay reasonable expenses, including loss of wages and a $250 travel per diem, incurred by **you** if **we** require **you** to attend depositions, arbitration proceedings, or trials in connection with the defense of a covered **claim**, but **we** will not pay more than an aggregate of $10,000 per **claim** for such expenses, regardless of the number of **insured**s.

No **retention** will apply to amounts **we** pay under this subsection **F**, and such amounts will be in addition to, and not part of, the Aggregate Limit.

**G. Subpoena Assistance**

**We** will pay up to the limit stated in **3.F** of the Declarations for the reasonable and necessary fees, costs, and expenses incurred with **our** prior consent to respond to a subpoena arising from the performance of **your professional services**, provided **you** first receive notice of such subpoena during the **policy period**, it relates to **your professional services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section V. **Your** obligations.

No **retention** will apply to amounts **we** pay under this subsection **G**, and such amounts will be in addition to, and not part of, the Aggregate Limit.

**H. Third party discrimination**

**We** will pay **damages** and **claim expenses** up to the limit stated in **3.G** of the Declarations for any **claim** against **you** for **third party discrimination**, provided the **claim** is first made against **you** during the **policy period**, it directly results from **your professional services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section V. Your obligations.

**You** must pay the **retention** stated in the Declarations in connection with any payment **we** make under this subsection **H.** This limit will be part of and not in addition to the limit of liability stated in **3.A.** of the Declarations.

**I. Contingent personal injury and advertising liability**

**We** will pay **damages** and **claim expenses** for any **claim** against **you** arising from an alleged negligent act, error, or omission resulting in **personal and advertising injury,** provided the **claim** is first made against **you** during the **policy period**, it directly results from **your professional services** performed on or after the **retroactive date**, and it is reported to **us** in accordance with Section V. Your obligations.

## IV. Defense and Settlement – Our obligations to you

**A. Defense**

**We** have the right and duty to defend any covered **claim**, even if such **claim** is groundless, false, or fraudulent.

**We** have the right to select and appoint counsel to defend **you** against a covered **claim**. **You** may request in writing that **we** appoint defense counsel of **your** own choice, but whether to grant or deny such a request will be at **our** sole discretion.

**B. Settlement**

**We** have the right to solicit and negotiate settlement of any **claim** but will not enter into a settlement without **your** consent, which **you** agree not to withhold unreasonably. If **you** withhold consent to a settlement recommended by **us** and acceptable to the party who made the **claim**, the most **we** will pay is the sum of:

**1.** the amount of **our** recommended settlement,

**2.** **claim expenses** incurred up to the date of **our** recommendation,

**3.** 50% of all **claim expenses** incurred after **our** recommendation, and

**4.** 50% of all **damages** in excess of the settlement amount recommended by **us**.

**V. Your obligations**

**A. Notifying us of claims and coverage enhancements**

**You** must give written notice to **us** of any **claim**, or any other matter covered under Section III. Coverage enhancements, as soon as possible, but in any event, no later than 60 days after the end of the policy period.

All such notifications must be in writing and include a copy of the **claim** or other covered matter and must be submitted to **us** via the designated email address or mailing address identified in Item 6 of the Declarations.

**B. Notifying us of potential claims**

**You** have the option of notifying **us** of potential claims that may lead to a covered **claim** against **you**. In order to do so, **you** must give **us** written notice as soon as possible and within the **policy period**. To the greatest extent possible, the notice must identify the details of the potential claim, including identifying:

**1.** The potential claimant(s),

**2.** The likely basis for liability,

**3.** The likely demand for relief, and

**4.** Any additional information about the potential **claim we** may reasonably request.

The benefit to **you** of notifying **us** of a potential **claim** is that if an actual **claim** arises from the same circumstances as the properly notified potential **claim**, then **we** will treat that **claim** as if it had first been made against **you** on the date **you** properly notified **us** of it as a potential **claim**, even if that **claim** is first made against **you** after the **policy period** has expired.

All potential **claim** notifications must be in writing and submitted to **us** via the designated email address or mailing address identified in Item 6 of the Declarations.

**C. Retention**

1. Our obligation to pay damages and claim expenses under this policy is in excess of the retention, which you must pay in connection with each covered claim.

2. We will reduce your **retention** by fifty percent (50%) or $25,000, whichever is less, for any **claim** that is resolved at arbitration or mediation prior to the initiation of a lawsuit.

## VI. Exclusions – What is not covered by this policy

**A.** Applicable to all coverage provided under this **policy**.

**B.** **We** will have no obligation to pay any sums under this policy, including any damages or claim expenses, for any claim:

**1. Antitrust and deceptive trade practices**

Based upon or arising out of any actual or alleged:

**a.** False, deceptive, or unfair trade practices,

**b.** Unfair competition, impairment of competition, restraint of trade, or antitrust violations,

**c.** Violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, all including as may be amended, or any similar federal, state, or local statutes, rules, or regulations in or outside the U.S., or

**d.** deceptive or misleading advertising.

**2. Bodily injury and property damage**

Based upon or arising out of any actual or alleged **bodily injury** or **property damage.** However, this exclusion will not apply to **bodily injury** or **property damage** directly resulting from **your professional services** and covered under Section **III.A.**

**3. Breach of contract, warranty, or guarantee**

Based upon or arising out of:

**a.** Any actual or alleged breach of any contract or agreement, or any liability of others that **you** assume under any contract or agreement,

**b.** Any warranty, guaranty, or promise made by an **insured** as to the future value of investments, businesses or real property investments, or the failure of any investments to perform as expected or desired; or

**c.** Any actual or alleged breach of express warranties or guarantees, except any warranty or guarantee to perform **your professional services** consistent with applicable industry standards or with reasonable skill or care.

Provided, however, this exclusion will not apply to any liability **you** would have in the absence of the contract, warranty, or guarantee.

**5. Communicable Disease**

Based upon or arising out of any actual or alleged the actual or alleged transmission of a communicable disease.

This exclusion applies even if the **claims** against any **insured** allege negligence or other wrongdoing in the: a. Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease; b. Testing for a communicable disease; c. Failure to prevent the spread of the disease; or d. Failure to report the disease to authorities.

**6. Cyber-Liability**

Based upon or arising out of any actual or alleged:

**a.** Unauthorized acquisition, access, use, or disclosure of, improper collection or **retention** of, or failure to protect any non-public personally identifiable information or confidential corporate information that is in **your** care, custody, or control,

**b.** Violation of any privacy law or consumer data protection law protecting against the use, collection, or disclosure of any information about a person or any confidential corporate information, or

**c.** Act by a third party that influences or psychologically manipulates **you** to perform an action, break security procedures, divulge personal or confidential information, or perform a fraudulent act for the purpose of information gathering, fraudulent or unauthorized electronic funds transfer, system or network access or the theft of personal or confidential information.

**7. Criminal proceedings**

Brought in the form of a criminal proceeding, including but not limited to a criminal investigation, grand jury proceeding, or criminal action.

**8. Employment related liability**

Based upon or arising out of any actual or alleged:

**a.** obligation under any workers' compensation, unemployment compensation, employers' liability, fair labor standards, labor relations, wage and hour, or disability benefit law, including any similar provisions of any federal, state, or local statutory or common law,

**b.** the indemnification or contribution with another employer for bodily injury, sickness, disease, death, or emotional distress to any of **your** employee arising out of his or her employment by **you**.

**c.** liability or breach of any duty or obligation owed by **you** as an employer or prospective employer, or

**d.** harassment, wrongful termination, retaliation, or discrimination, including but not limited to adverse or disparate impact, committed by **you** as an employer or prospective employer.

**9. Excluded costs and damages**

To the extent it seeks or includes:

**a.** fines, penalties, taxes, or sanctions against **you**,

**b.** overhead costs, general business expenses, salaries, or wages incurred by **you**,

**c.** the return, reduction, or restitution of fees, commissions, profits, or charges for goods provided or services rendered,

**d.** liquidated or multiple **damages**,

**e.** restitution, disgorgement of profits, any advantage to which **you** were not legally entitled, or unjust enrichment, or

**f.** the cost of complying with injunctive relief.

**10. Excluded professional services**

Based upon or arising out of any actual or alleged:

**a.** performance of or failure to perform services as an architect, engineer, accountant, lawyer, registered investment advisor, or securities broker/dealer, or

**b.** Medical malpractice or breach of any duties owed as a healthcare provider, including but not limited to the rendering of or failure to render medical services, treatment, diagnosis, or advice.

**11. Excluded statutory violations**

Based upon or arising out of any actual or alleged violation of the following laws:

**a.** the Securities Act of 1933,

**b.** the Securities Exchange Act of 1934,

**c.** any state blue sky or securities laws,

**d.** the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., or

**e.** the Employee Retirement Income Security Act of 1974,

all including as may be amended, or any similar provisions of any foreign, federal, state, or local statutory or common law and any rules or regulations promulgated under such laws.

**12. Failure to maintain insurance or bonds**

Based upon or arising out of any actual or alleged failure to procure or maintain adequate insurance or bonds.

**13. Improper billing and use of client funds**

Based upon or arising out of any actual or alleged:

**a.** Inaccurate, improper, or fraudulent billings or invoices, including but not limited to a qui tam action or any action under the False Claims Act, as may be amended, or any similar provisions of any foreign, federal, state, or local statutory or common law, or

**b.** **Your** improper use of any client funds, monies, assets, or property, or the inability or failure to pay, collect, or safeguard funds

Provided, however, this exclusion will not apply to a **claim** resulting from **your** performance of billing services for others if such services are a part of **your professional services**.

**14. Insured vs. insured**

Brought by or on behalf of one **insured** or **affiliate** against another **insured** or **affiliate**. However, this exclusion will not apply to a **claim** by an **additional insured** against another **insured** based upon or arising out of any other **insured**'s performance of **professional services** for the **additional insured**.

**15. Intentional acts**

Based upon or arising out of any actual or alleged fraud, dishonesty, criminal conduct, or any knowingly wrongful, malicious, or intentional acts or omissions, except that:

**a.** **We** will pay **claim expenses** until there is a final adjudication establishing such conduct, and

**b.** This exclusion will not apply to otherwise covered intentional acts or omissions resulting in **personal and advertising injury**.

This exclusion will apply to the **named insured** or **subsidiary** only if the conduct was committed or allegedly committed by any:

**a.** Partner, director, officer, or member of the board (or equivalent position) of the **named insured** or **subsidiary**, or

**b.** **Employee** of the **named insured** or **subsidiary** if any partner, director, officer, member of the board (or equivalent position) of the **named insured** or **subsidiary** knew or had reason to know of such conduct by the **employee**.

This exclusion will apply separately to each **insured** and will not apply to any **insured** who did not commit, participate in, acquiesce to, or ratify such conduct committed by another **insured**.

**16. Management liability**

Based upon or arising out of the performance of or failure to perform **professional services** for a corporation, partnership, limited liability company, limited partnership, or other entity of which any **insured** or any **employee** of an **insured** is a partner, director, officer, member, board member, trustee, or equivalent position.

**17. Manufacture of goods or products**

Based upon or arising out of any goods or products manufactured, sold, handled, or distributed by **you**.

**18. Misappropriation of funds**

Based upon or arising out of the actual or alleged theft, misappropriation, commingling, or conversion of any funds, monies, assets, or property.

**19. Motor vehicle, aircraft, or watercraft**

Based upon or arising out of the ownership, maintenance, operation, use, loading of any motor vehicle, aircraft or watercraft owned or operated by or loaned to **you**.

**20. Patent or Trade Secrets**

Based upon or arising out of any actual or alleged infringement of any patent or the theft of any trade secret.

**21. Other excluded activities**

Based upon or arising out of the actual or alleged:

**a.** Compilation of audited financial statements, or

**b.** Performance or failure to perform:

- **i.** Forensic accounting services, or
- **ii.** Services as an enrolled agent, or
- **iii.** Audit attestation services.

**c.** Performance or failure to perform investment advisory services, including but not limited to:

- **i.** The selection of any investment manager, investment advisory, custodial or similar firm,
- **ii.** The promise or guarantee of the future performance of value of investments, or rate of return or interest,
- **iii.** The fluctuation in the value of any security,
- **iv.** Any failure of investments to perform as expected or desired, or
- **v.** Acting as an investment advisor as defined in Section 202 (11) of the Investment Advisors Act of 1940,
- **vi.** The exercise of any authority or discretionary control by **you** with respect to any client's funds or accounts, including any monies or property of employee benefit or pension plans.

**d.** The performance of any services in connection with mergers and/or acquisitions,

**e.** Price discounts, prizes, awards, money or valuable consideration given in excess of a total contracted or expected amount, or

**f.** Forgery or counterfeiting.

**22. Pollution or environmental**

Based upon or arising out of any actual, alleged, or threatened discharge, dispersal, release, or escape of **pollutants**, including any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **pollutants**.

**23. Prior acts, notice, or knowledge**

Based upon or arising out of any actual or alleged breach of duty or negligent act, error, or omission that:

**a.** Was committed prior to the **retroactive date**,

**b.** Was the subject of any notice given under any other policy of which this policy is a renewal or replacement,

**c.** Was the subject of, or is related to, any **claim**, written demand, arbitration, administrative or regulatory proceeding or investigation, or licensing proceeding that was filed or commenced against **you** and of which **you** had notice prior to the **policy period**, or

**d.** **You** had knowledge of prior to the **policy period**, and there was a reasonable basis to believe that the act, error, or omission could result in a **claim**.

However, if this policy is a renewal or replacement of a previous policy that **we** issued, provided materially identical coverage, and is part of an unbroken chain of successive policies issued by **us**, then the **policy period** referred to in paragraphs **c.** and **d.**, above, will be the **policy period** of the first such policy **we** issued.

**24. Prior or pending litigation**

Based upon or arising out of any litigation pending as of or prior to the effective date of this policy. However, if this policy is a renewal or replacement of a previous policy that **we** issued, provided materially identical coverage, and is part of an unbroken chain of successive policies issued by **us**, then the effective date referred to above, will be the effective date of the first such policy **we** issued.

**25. Subsidiary outside control of named insured**

**a.** Based upon or arising out of **professional services** performed by or on behalf of a past or present **subsidiary** while the **named insured** does not have majority ownership or management control of it, or

**b.** Made against a **subsidiary** or anyone acting on its behalf while the **named insured** does not have majority ownership or management control of it.

**26. Unsolicited telemarketing**

Based upon or arising out of any actual or alleged violation of any federal, state, local, or foreign statutes, ordinances, or regulations relating to unsolicited telemarketing, solicitations, emails, faxes, text messages, or any other communications of any type or nature, including but not limited to the Telephone Consumer Protection Act, CAN-SPAM Act, or any "anti-spam" or "do-not-call" statutes, ordinances, or regulations.

## VII. Your obligations to us

**A. Named insured responsibilities**

It will be the responsibility of the **named insured** (or, if there is more than one **named insured**, the first one listed on the Declarations) to act on behalf of all **insured**s with respect to the following:

**1.** Timely giving and receiving notice of cancellation or non-renewal,

**2.** Timely payment of premium,

**3.** Receipt of return premiums,

**4.** Timely acceptance of changes to this policy, and

**5.** Timely payment of **retentions**.

**B. Your duty to cooperate**

**You** must cooperate with **us** in the defense, investigation, and settlement of any claim, potential claim, breach, event, occurrence, or other matter notified to **us**, including but not limited to:

**1.** Notifying **us** immediately if **you** receive any settlement demands or offers, and sending **us** copies of any demands, notices, summonses, or legal papers,

**2.** Submitting to examination and interrogation under oath by **our** representative and giving **us** a signed statement of **your** answers,

**3.** Attending hearings, depositions, and trials as **we** request,

**4.** Assisting in securing and giving evidence and obtaining the attendance of witnesses,

**5.** Providing written statements to **our** representative and meeting with such representative for the purpose of investigation and/or defense,

**6.** Providing all documents and information **we** may reasonably request, including authorizing **us** to obtain records, and

**7.** Pursuing **your** right of recovery from others.

**C. Your obligation not to incur any expense or admit liability**

**You** must not make any payment, incur any expense, admit any liability, or assume any obligation without **our** prior consent. If **you** do so, it will be at **your** own cost and expense.

**D. Your representations**

**You** warrant that all representations made and all materials submitted by **you** or on **your** behalf in connection with the **application** for this policy are true, accurate, and not misleading, and agree they were relied on by **us** and were material to **our** decision to issue this policy to **you**.

Further, if such **application** was another insurance carrier's application, you further agree and understand that **we** relied upon all statements, warranties and other information and documents contained in or submitted with such other application as if they were submitted directly to **us** using **our** own application form.

If **we** learn any of the representations or materials were untrue, inaccurate, or misleading in any material respect, **we** are entitled to treat this policy as if it had never existed.

## VIII. Other provisions affecting coverage

### A. Payment of claims expenses without reduction of the limit of liability

1. **We** will pay **claims expenses** in excess of the applicable **retention** and up to an aggregate amount equal to the **each claim limit** stated in **3.A** of the Declaration without reduction of the applicable **each claim limit**. The total amount of such **claims expense** payments by **us** will capped at the amount of the **each claim limit**, and is not on a per **claim** basis.

2. Once **we** have paid the **each claim limit** set forth in **3.A** of the Declarations in aggregate **claims expenses** arising from or relating to any and all matters, all further payments by the **Insurer** of **claims expenses** will reduce the applicable **each claim limit** and **aggregate limit**.

### B. Limits of liability

1. Except as otherwise stated in Section **VII.A**, **our** maximum liability for the sum of all **damages** and all **claims expenses** because of all **claims,** (including all **claims** alleging **related claims**) first made and reported during the **policy period** will never exceed the amount stated in **3.A** of the Declarations.

2. All **your claims** arising out of the same **wrongful act** and all **your related claims** will be deemed to be one **claim**, and such **claim** will be deemed to be first made on the date the earliest of such **claims** is first made, regardless of whether such date is before or during the **policy period**. All **damages** and all **claims expenses** resulting from a single **claim** will be deemed a single **damage** and **claims expense** and shall be allocable to the policy in effect on the date the **claim** is first made, regardless of whether such date is before or during the Policy Period.

3. Except as otherwise stated in section **VII.A**, any payment of **damages** and/or **claims expenses** by **us** will reduce the limit of liability stated in **3.A** of the Declarations.

4. **We** are entitled to pay **damages** and **claims expenses** as they become due and payable by the **Insureds**, without consideration of other future payment obligations.

5. Once the **aggregate limit of liability** has been exhausted by payments of any **damages** (regardless of whether the payment by **us** of **claims expenses** under section **VII.A.** has

exhausted, reached or exceeded the **each claims limit** set forth in **3.A** of the Declarations), **our** obligation under this **policy** will be completely fulfilled and extinguished.

**C. Related claims**

All **related claims**, regardless of when made, will be treated as one claim, and all subsequent **related claims** will be deemed to have been made against **you** on the date the first such claim was made. If, by operation of this provision, the claim is deemed to have been made during any period when **we** insured **you**, it will be subject to only one **retention** and one Each Claim Limit regardless of the number of claimants, **insureds**, or claims involved.

**D. Alteration and assignment**

No change in, modification of, or assignment of interest under this policy will be effective unless made by written endorsement to this policy signed by **our** authorized representative.

**E. Bankruptcy or insolvency**

**Your** bankruptcy or insolvency will not relieve **us** of any of **our** obligations under this policy.

**F. Cancellation**

**1.** This policy may be canceled by the **named insured** by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations.

**2.** This policy may be canceled by **us** by mailing to the **named insured** by registered, certified, or other first class-mail, at the **named insured**'s address stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. The effective date of the cancellation will be no less than 60 days after the date of the notice of cancellation, or 10 days if the cancellation is due to nonpayment of premium.

**3.** The mailing of the notice will be sufficient proof of notice, and this policy will terminate at the date and hour specified in the notice.

**4.** If this policy is canceled by the **named insured**, **we** will retain the customary short rate proportion of the premium.

**5.** If this policy is canceled by **us**, **we** will return a pro rata proportion of the premium.

**6.** Payment or tender of any unearned premium by **us** will not be a condition precedent to the cancellation, but such payment will be made as soon as possible.

**G. Change in control**

If, during the **policy period**, the **named insured** consolidates with, merges into, or sells all or substantially all of its assets to any other person or entity, or any other person or entity acquires ownership or control of the **named insured**, then the **named insured** will provide

**us** written notice no later than 30 days after the effective date of such change in control, together with any other information **we** may require.

**We** will not cancel this policy solely because of a change in control. Rather, this policy will cover only **claims** arising from **professional services** performed prior to the change in control, unless **you** and **we** agree in writing otherwise, after the effective date of any change in control.

**H. Coverage territory**

This policy will apply to **your professional services** performed anywhere in the world, provided that any litigation, legal action, arbitration, mediation or other proceeding is brought within the United States, its territories or possessions, or Canada.

**I. Estates, heirs, legal representatives, spouses, and domestic partners**

In the event of an **employee's** death or disability, this policy will also apply to claims brought against the **employee's**:

1. Heirs, executors, administrators, trustees in bankruptcy, assignees, and legal representatives, or
2. Lawful spouse or lawful domestic partner,

but only:

1. For a covered claim arising from the scope of the **employee's** work for **you**, or
2. In connection with their ownership interest in property which the claimant seeks as recovery in a covered claim arising from the scope of the **employee's** work for **you**.

**J. False or fraudulent claims**

If any **insured** commits fraud in connection with any **claim** or potential **claim**, whether regarding the amount or otherwise, this insurance will become void as to that **insured** from the date the fraud is committed.

**K. Other insurance**

Any payment due under this policy is specifically excess of and will not contribute with any other valid and collectible insurance unless such other insurance is written specifically as excess insurance over this policy.

**L. Subrogation**

1. In the event of any payment by **us** under this policy, **we** will be subrogated to all of **your** rights of recovery to that payment.
2. **You** will do everything necessary to secure and preserve **our** subrogation rights, including but not limited to the execution of any documents necessary to allow **us** to bring suit in **your** name.
3. **You** will do nothing to prejudice **our** subrogation rights without **our** prior written consent.

4. Any recovery first will be paid to **you** up to the amount of any **retention you** have paid, and then to **us** up to the amount of any covered amounts **we** have paid.

**M. Titles**

Titles of sections of and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate.

## IX. Extended reporting periods

**A. Automatic extension period**

If a wrongful act is committed by the **you** prior to the effective date of cancellation or non-renewal, and a **claim** is made against **you** within 60 days of the cancellation or non-renewal date, **you** have 60 days from the cancellation or non-renewal date to give **us** written notification of the **claim**. If **you** have obtained another professional liability or errors and omissions policy or any other valid insurance is in force, this automatic extension period is not applicable. Further, this automatic extension period does not apply to any cancellation resulting from non-payment of premium or non-compliance with the terms and conditions of this policy.

**B. Optional extension period**

1. If **we** or the **named insured** cancel or non-renew this policy, then the **named insured** will have the right to purchase an optional extension period for the duration and at the percentage of the expiring premium stated in Item 5 of the Declarations. The optional extension period, if purchased, will start on the effective date of cancellation or non-renewal. However, the right to purchase an optional extension period will not apply if:

   a. this policy is canceled by **us** for nonpayment of premium, or

   b. the total premium for this policy has not been fully paid.

2. The optional extension period will apply only to claims that:

   a. are first made against **you** and reported to **us** during the optional extension period, and

   b. arise from **your professional services** performed, or a breach, offense, or occurrence that takes place, on or after the **retroactive date** but prior to the effective date of cancellation or non-renewal of this policy.

3. The additional premium will be fully earned at the inception of the optional extension period.

4. Notice of election and full payment of the additional premium for the optional extension period must be received by **us** within 30 days after the effective date of cancellation or non- renewal, otherwise any right to purchase the optional extension period will lapse.

The limits of liability applicable during any purchased optional extension period will be the remaining available Aggregate Limit. There will be no separate or additional limit of liability available for any purchased optional extension period.

## X. Definitions

**A. Additional insured** means any person or organization **you** have agreed in a written contract or agreement to add as an **additional insured** to a policy providing the type of coverage afforded by this Coverage Part, provided the contract or agreement:

  **1.** Is currently in effect or becomes effective during the **policy period**, and

  **2.** Was executed before the **professional services** out of which the **claim** arises were performed.

**B. Affiliate** means any person or entity related to any **insured** through common ownership, control, or management. **Affiliate** does not include a **subsidiary**.

**C. Application** means the signed **application** for the policy and any attachments and materials submitted with that **application**. If this policy is a renewal or replacement of a previous policy issued by **us**, **application** also includes all previous signed **applications**, attachments, and materials. **Application** also includes another insurance carrier's application submitted by or on behalf of you and accepted by **us**.

**D. Bodily injury** means physical injury, sickness, disease, or death sustained by a person, and any resulting humiliation, mental injury, mental anguish, emotional distress, suffering, or shock.

**E. Claim** means any written assertion of liability or any written demand for financial compensation or non- monetary relief.

**F. Claim expenses** means the following sums incurred in excess of the **retention** and with **our** prior written consent:

  **1.** all reasonable and necessary fees, costs, and expenses (including the fees of attorneys and experts) incurred in the investigation, defense, or appeal of a **claim**, and

  **2.** premiums on appeal bonds, attachment bonds, or similar bond, but **we** will have no obligation to apply for or furnish any such bonds.

**G. Crisis management event** means the public announcement of the following events which, in **your** good faith opinion, had or is reasonably likely to have an adverse impact on **your** reputation:

  **1.** An actual or alleged negligent act, error, or omission in the performance of **your professional services** on or after the **retroactive date**,

  **2.** The death, incapacity, or criminal indictment of any partner, director, officer, or board member (or equivalent position) of the **named insured**, or

  **3.** An **employee** was the victim of a violent crime while on the **named insured's** premises.

**H.** **Damages** means the following amounts incurred in excess of the **retention**:

1. a monetary judgment or monetary award that **you** are legally obligated to pay (including pre- or post-judgment interest and awards of **claim**ant's attorney fees), or
2. a monetary settlement negotiated by **us** with **your** consent.

Damages includes punitive **damages** to the full extent they are insurable under the law of any applicable jurisdiction that most favors coverage.

**I.** **Employee** means any past, present, or future:

1. persons employed by the **named insured** or **subsidiary** as a permanent, part-time, seasonal, leased, or temporary **employees**, or any volunteers, or
2. partners, principal, shareholder, directors, officers, member or board members (or equivalent position) of the **named insured** or **subsidiary**,

but only while in the course of their performance of **professional services** on behalf of or at the direction of such **named insured** or **subsidiary**.

**J.** **Independent contractor** means any persons or entities contracted by the **named insured** or **subsidiary** to perform the same **professional services** as the **named insured** or **subsidiary**, but only while in the course of their performance of **professional services** on behalf of or at the direction of the **named insured** or **subsidiary.**

**K.** **Infringement Claim** means any **claim** alleging or arising out of any actual or alleged infringement of any copyright, trademark, trade dress, trade name, service mark, service name, title or slogan.

**L.** **Insured** mean:

1. The **named insured,**
2. A **subsidiary**,
3. **Employees,**
4. An **Independent contractor**,
5. A **joint venture**, and
6. An **additional insured**. **You** should note that coverage is available for **additional insureds** solely for their liability arising out of **your** negligence or of those acting on **your** behalf and not for any liability arising out of the sole negligence of the **additional insured**. Further, once the **claim** ceases to be made or maintained against **you** then coverage provided to the **additional insured** shall cease to apply.

**M.** **Joint venture** means a business enterprise in which the **named insured** or **subsidiary** participates pursuant to a written agreement, but only for:

1. **Professional services** performed by the **named insured** or **subsidiary**, and
2. The same percentage of covered **damages** and **claim expenses** as the percentage of the **named insured**'s or **subsidiary's** participation in the **joint venture.**

**N.** **Named insured** means the individual, corporation, partnership, limited liability company, limited partnership, or other entity identified in Item 1 of the Declarations.

**O.** **Personal and advertising injury** means injury, other than **bodily injury** or **property damage**, arising out of one or more of the following offenses:

**1.** false arrest, detention, or imprisonment,

**2.** malicious prosecution,

**3.** wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of premises,

**4.** slander, libel, or defamation, or disparagement of goods, products, or services, whether in connection with **your professional services** or **your** advertising of it, or

**5.** oral or written publication of material, whether in connection with **your professional services** or **your** advertising of it, that violates a person's right of privacy.

**P.** **Policy period** means the period of time identified in Item 2 of the Declarations, and any optional extension period, if purchased.

**Q.** **Pollutants** means any solid, liquid, gaseous, biological, radiological, or thermal irritant or contaminant, including smoke, vapor, asbestos, silica, dust, nanoparticles, fibers, soot, fumes, acids, alkalis, chemicals, nuclear materials, germs, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed.

**R.** **Potential claim** means any acts, errors, or omissions of an **insured** or other circumstances reasonably likely to lead to a **claim** covered under this policy.

**S.** **Professional services** means the services scheduled in Item **9.** of the Declarations that are provided by **you** to a third party for a fee or other consideration, including such services that are performed electronically using the Internet or a network of two or more computers.

**Professional services** also includes:

**1.** The provision of **technology services** performed in conjunction with any other **professional services**,

**2.** Services as a member of a formal accreditation, ethics, peer review, standards, or licensing board, if performed with the knowledge and consent of the **Named Insured.**

**T.** **Property damage** means physical damage to or destruction of any tangible property, including the resulting loss of use of that property.

**U.** **Related claims** means all claims that are based upon, arise out of, or allege:

**1.** a common fact, circumstance, situation, event, service, transaction, cause, or origin,

**2.** a series of related facts, circumstances, situations, events, services, transactions, sources, causes, or origins,

3. a continuous or repeated act, error, or omission in the performance of **your professional services**, or

4. the same breach, occurrence, or offense.

The determination of whether a claim is related to another claim or claims will not be affected by the number of claimants or **insured**s involved, causes of action asserted, or duties involved.

**V. Retention** means the amount or time identified as such in the Declarations.

**W. Retroactive date** means the date identified as such in the Declarations.

**X. Subsidiary** means any entity or entities of which the **named insured** has majority ownership before or during the **policy period.**

**Y. Technology services** means:

1. Electronic media operations,
2. Data processing,
3. The design or formulation of electronic data processing programs or systems,
4. Consulting and training in the use of software,
5. The ordering and installation of software,
6. The performance of feasibility studies and recommendations regarding computer technology objectives and needs of others, or
7. Electronic activities performed for others in the ordinary course of the **Insured's** business.

**Z. Third party discrimination** means any non-physical harassment of or unlawful discrimination against a person or entity other than an **insured** or an **employee** of an **insured**, including any resulting violation of civil rights, but only if such harassment or discrimination directly results from **your** performance of **professional services**.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treas- ury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004 

**This Endorsement Modifies Your Policy.**
**Please Read It Carefully.**

## SERVICE OF SUITS ENDORSEMENT

The Company appoints the Commissioner of Insurance as its true and lawful attorney for acceptance of service of all legal process issued in this state in any action, suit or proceeding arising out of this contract of insurance.

The Company authorizes the Commissioner to forward such process to:

Accelerant Specialty Insurance Company
400 Northbridge Road
Suite 800
Sandy Springs, GA 30350
Attn: Legal Counsel

The above-named is authorized to accept service of process on behalf of the Company in any legal proceeding.

# CLAIM NOTICE

THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.

In the event of a claim to which this policy may apply, please give immediate notice to:

Premier Claims Management, LLC.
2020 North Tustin Avenue
Santa Ana, CA 92705

Tel: 888-683-2266
Fax: 866-885-4047
Email: claims@premierclaimsllc.com
www.premierclaimsllc.com

**This Endorsement Modifies Your Policy.**
**Please Read It Carefully.**

# NUCLEAR INCIDENT EXCLUSION (BROAD FORM) ENDORSEMENT

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

**We** will have no obligation to pay any sums under this policy, including any **damages**, **claim expenses**, or other covered amounts, for any **claim**, **event**, or **occurrence**:

**A.** For injury, sickness, disease, death, or destruction:

**1.** For which **you** are also insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for exhaustion of its limit of liability, or

**2.** Resulting from the hazardous properties of nuclear material and with respect to which:

**a.** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, as amended, or

**b.** **You** are, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, for expenses incurred with respect to bodily injury, sickness, disease, or death resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

**C.** Under any liability coverage, for injury, sickness, disease, death, or destruction resulting from the hazardous properties of nuclear material, if:

**1.** The nuclear material is at any nuclear facility owned or operated by **you** or on **your** behalf, or has been discharged or dispersed from such a facility,

**2.** The **nuclear material** is contained in **spent fuel** or **waste** which is or was at any time possessed, handled, used, processed, stored, transported, or disposed of by **you** or on **your** behalf, or

**3.** The injury, sickness, disease, death, or destruction arises out of the furnishing by **you** of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to injury to or destruction of property at such **nuclear facility**.

**D.** As used in this endorsement:

**1.** **Hazardous properties** includes radioactive, toxic, or explosive properties,

**2.** **Nuclear material** means source material, special nuclear material, or byproduct material,

3. **Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material,
4. **Source material, special nuclear material**, and **byproduct material** have the meanings given them in the Atomic Energy Act of 1954, as amended,
5. **Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor,
6. **Waste** means any waste material:
    - **a.** Containing **byproduct material**, and
    - **b.** Resulting from the operation by any person or organization of any **nuclear facility** included in paragraph 1 or 2 of the definition of **nuclear facility**,
7. **Nuclear facility** means:
    - **a.** any any nuclear reactor;
    - **b.** any any equipment or device designed or used for:
        - **i.** separating the isotopes of uranium or plutonium;
        - **ii.** processing or utilizing spent fuel; or
        - **iii.** handling, processing, or packaging waste;
    - **c.** Any equipment or device used for the processing, fabricating, or alloying of **special nuclear material**, if at any time the total amount of such material in **your** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235, or
    - **d.** Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of waste.

    **Nuclear facility** includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations.

    With respect to injury to or destruction of property, “injury" or "destruction" includes all forms of radioactive contamination of property.

**This Endorsement Modifies Your Policy.**
**Please Read It Carefully.**

## PERSONAL CONCIERGE/ASSISTANT AMENDATORY ENDORSEMENT

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the Professional Services Liability Policy is amended as follows:

The following exclusions are added to the end of Section **VI. Exclusions – What is not covered by this policy:**

**A.** The following exclusions are added to Section **VI. Exclusions – What is not covered by this policy:**

**a. Transportation of persons, animals, or goods**

Based upon or arising out of any actual or alleged the:

**1.** Transportation of any person, animal, or good, or

**2.** Operation of any livery service.

**b. Restricted activities**

Based upon or arising out of **your** performance of or failure to perform **pprofessional sservices** in connection with the following industries, fields, or activities:

**1.** Adult daycare services,

**2.** Chauffeuring,

**3.** Childcare or nanny services,

**4.** Cleaning or janitorial services,

**5.** Financial or investment advice,

**6.** Healthcare or related services,

**7.** Home health aide/caregiver services,

**8.** The moving or relocation of a client's personal or business property,

**9.** Pet sitting or pet care,

**10.** Private security services, or

**11.** Social work.

**c. Misuse of confidential information**

Based upon or arising out of the intentional misuse of confidential or proprietary information.

**d. Sexual Abuse and Molestation**

Based upon or arising out of or attributable to **Sexual abuse and molestation**, including:

1. any allegation that an insured negligently, recklessly, or intentionally employed, investigated, supervised, or retained any person who allegedly or committed such acts, or

2. any alleged practice, policy or custom, including any violation of a civil right, that gave rise to, caused, or resulted in such **sexual abuse and molestation**.

**e. Notarization without physical appearance**

Based upon or arising out of any actual or alleged notarization, certification, or acknowledgment of a signature without the physical appearance of the person making the signature at the time of such notarization, certification, or acknowledgment.

**B.** Section **X. Definitions** is amended as follows:

**1.** The definition of **Professional services** is amended with the addition of the following:

**Professional services** also includes the provision of **auxiliary business services** performed in conjunction with the any other **professional services**.

**2.** The following definition is added:

**a. Auxiliary business services** mean:

**1.** Services provided by **you** as a notary public,

**2.** Bookkeeping and payroll services, or

**3.** Business tax return preparation services,

to a third party for a fee or other consideration.

**b. Sexual Abuse and Molestation** means any actual, attempted, or alleged criminal sexual conduct of a person by another person, or persons acting in concert, which causes physical and/or mental injuries, including sexual molestation, sexual assault, sexual exploitation, or sexual injury.

**This Endorsement Modifies Your Policy.**
**Please Read It Carefully.**

## GENERAL LIABILITY REQUIREMENT ENDORSEMENT

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

Section **V. Your obligations**, is amended with the addition of the following:

**General Liability Requirement**

As a condition precedent to coverage under this policy, **you** must maintain General Liability insurance coverage, including Products Completed Operations coverage, with limits of liability of not less than the limit stated in **3.B** of the Declarations, on a continuous basis, during the **policy period.** Failure to maintain such General Liability insurance coverage will result in the voiding of all coverage under Section **III. Coverage Enhancements**, sub-section **A. Contingent Bodily Injury/Property Damage.**

**We** will have no obligation to pay any sums under this policy, including any **damages** or **claim expenses,** for any **claim** or occurrence covered by the General Liability insurance required by this Endorsement, or for any **claim** or occurrence that would be covered but for **your** failure to maintain such required General Liability insurance.

**This Endorsement Modifies Your Policy.**
**Please Read It Carefully.**

## CLAIMS EXPENSES WITHIN THE LIMIT ENDORSEMENT

In consideration of the premium charged, it is hereby agreed that Section **VIII. Other provisions affecting coverage** is amended as follows:

**A.** Subsection **A. Payment of claims expenses without reduction of the limit of liability** is deleted in its entirety.

**B.** Subsection **B. Limits of liability** is amended as follows:

   **1.** Subsection **1.** Is deleted and replaced with the following:

      **1.** **Our** maximum liability for the sum of all **damages** and all **claims expenses** because of all **claims,** (including all **claims** alleging **related claims**) first made and reported during the **policy period** will never exceed the amount stated in **3.A** of the Declarations.

   **2.** Subsection **3.** Is deleted and replaced with the following:

      **3.** Any payment of **damages** and/or **claims expenses** by **us** will reduce the limit of liability stated in **3.A** of the Declarations.

**This Endorsement Modifies Your Policy.**
**Please Read It Carefully.**

## ADDITIONAL EXCLUSION ENDORSEMENT

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the Professional Services Liability Policy is amended as follows:

Section **VI. Exclusions – What is not covered by this policy** is amended with the addition of the following:

1. Based upon or arising out of the performance of or failure to perform services as an insurance agent or broker.

2. Based upon or arising out of the offer, sale or management of any HVAC system maintenance services, including, but not limited to, air or water filter systems.

3. Based upon, arising out of, or in any way involving:
a. The design, manufacture, fabrication, sale, maintenance of installation of any goods, products, machinery, or equipment which are sold, supplied, or distributed by an Insured or others under license from an Insured, or
b. Any recall of goods, products or systems designed or tested by an Insured, or any request, demand, investigation, or order to recall goods, products or systems designed or tested by an Insured.

4. Based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the over-redemption of coupons, awards or prizes from advertisements, promotions, games, sweepstakes, contests, rewards programs or games of chance.

5. Based upon, arising out of, or in any way involving any claim based upon or arising out of any actual or alleged performance of or failure to perform property management services. For the purpose of this exclusion, property management services means:
a. development and implementation of management plans and budgets,
b. oversight of physical maintenance of property,
c. solicitation, evaluation, and securing of tenants, management of tenant relations, collection of rent, and processing evictions,
d. development, implementation, and management of loss control and risk management plans for real property,
e. development, procurement, implementation, and management of contracts and subcontracts necessary to the daily functioning of real property,
f. personnel administration and record keeping,
g. leasing services in connection with the property you are managing, or
Property management services do not include the management or implementation of renovations or construction or reconstruction projects.

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELISABETH BEST, JENNA BUCKLEW, RACHEL IRIAS, CASSANDRA STEPHAN, *on behalf of themselves and on behalf of others similarly situated*,<br><br>Plaintiffs.<br><br>v.<br><br>SECOND NATURE BRANDS, INC.; SECOND NATURE INSURANCE SERVICES, LLC; QBE SPECIALTY INSURANCE COMPANY; COLUMBIA PROPERTY MANAGEMENT, LLC; and SCOTT BLOOM<br><br>Defendants. | Civ. No. 1:24-CV-01799-JMC |

**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Elisabeth Best, Jenna Bucklew, Rachel Irias, and Cassandra Stephan ("Plaintiffs"), on behalf of themselves and all others similarly situated, hereby allege for their First Amended Class Action Complaint the following:

1. This case involves the fraudulent and unlawful billing of mandatory fees to residential tenants for a "Resident Benefits Package," which provided no value or benefits to tenants, but instead benefitted landlords and property managers. Mandatory fees, such as these, are prohibited by District of Columbia law.

2. The fraudulent scheme was set up by Defendants Second Nature Brands Inc. and Second Nature Insurance Services, LLC (collectively "Second Nature") to create "Ancillary Revenue Opportunities" for landlords and property managers to bilk residential tenants through a

Case 1:24-cv-03587-JMC Document 21-2 Filed 09/13/24 Page 3 of 36

mandatory monthly service fee. And the entire scheme is laid out on its own website. Second Nature defines "Ancillary Revenue" as "any additional source of income generated by a property that is not directly related to its primary function or purpose." By implementing these "Ancillary Revenue Opportunities," "property managers can increase their income and offset some of the costs with maintaining the property." In other words, it is a way for landlords and property managers to push their overhead costs onto the tenants, while also establishing an "Ancillary Revenue" stream apart from the monthly rent. This is against the law in the District of Columbia.

3. The "Ancillary Revenue Opportunity" pitched by Second Nature is called the "Resident Benefits Package," by which the landlord or property manager charges a "mandatory" fee to tenants to extract more money from tenants. And the purported benefits to the residential tenants to justify these mandatory fees serve only to benefit the landlord and property manager. For instance, the fees cover (1) insurance (which provided coverage to the landlord and property manager); (2) HVAC filters (which is the responsibility of the landlord under D.C. law and were never actually provided to Plaintiffs); and (3) access to an online portal to pay rent and receive undefined "resident rewards." So, although the tenants are charged a monthly fee for these purported benefits, the direct beneficiaries were the landlord and property manager.

4. Nevertheless, mandatory fees, such as the "Resident Benefits Package" are unlawful under D.C. Code § 42–3502.11a, as well as the D.C. Consumer Procedure Protections Act ("CPPA"), D.C. Code § 28-3901, *et seq.*

5. QBE Specialty Insurance Company ("QBE") provided the insurance as part of this scheme under a "Master Policy" (policy number RML5880359), which was referred to as



KLAPROTH LAW PLLC
2300 WISCONSIN AVE NW SUITE 100A | WASHINGTON DC 20007
www.klaprothlaw.com

Case 1:24-cv-03587-JMC Document 2 Filed 09/15/25 Page 3 of 36

"Property Manager and Landlord Protection Policy" (hereinafter "Property Manager and Landlord Protection Policy" or "Policy").

6. In this particular case, Plaintiffs leased the property located at 1934 1st Street NW, Washington, DC 20001 (the "Property") for the term of July 1, 2023, through June 30, 2024. Columbia Property Management, LLC ("Columbia Property Management") and Scott Bloom ("Bloom") served as the property manager and entered into the lease on behalf of the landlord, 1934 First St Land Trust (the "Landlord"). As part of the lease, Columbia Property Management wrote into the lease that "Tenant Acknowledges that attached documents form part of this Lease: Appendix A, Appendix B, and the CPM Resident Handbook," although these documents were not attached to the lease. Without any authorization or agreement by the Plaintiffs, Columbia Property Management and Scott Bloom automatically enrolled the Plaintiffs in the "Resident Benefit Package," offered by Second Nature, and billed them $45.95 per month. This class action is brought to enjoin Defendants from charging tenants in the District of Columbia these illegal monthly fees, as well as to recover compensatory and statutory damages incurred, punitive damages, and attorneys' fees and costs.

7. Defendants' fraudulent scheme to charge District of Columbia tenants unlawful monthly fees came to light when Plaintiffs' rental house burned down on August 28, 2023. After the fire, Plaintiffs attempted to make an insurance claim for their damaged possessions. They then learned for the first time that the insurance for which they were charged for as part of the Resident Benefits Package, was not actually renter's insurance as had been represented to them, but instead a "Property Manager and Landlord Protection Policy," that included a mere $10,000 of coverage for the personal property of all four Plaintiffs even though their personal property damage

collectively exceeded $100,000. Because Defendants had represented to Plaintiffs that they had "Renter's Insurance" as part of the Resident Benefits Package, they did not obtain separate renter's insurance to cover their personal belongings. As a result of Defendants' misrepresentations, Plaintiffs were grossly underinsured and suffered significant damages.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this claim pursuant to 8 U.S.C. § 1332(d), as well as D.C. Code § 42-3502.18.

9. This Court has personal jurisdiction over the Defendants pursuant to D.C. Code § 13-423(a)(1)-(4).

10. Venue is proper in this Court as the acts and/or omissions alleged in this First Amended Complaint occurred in the District of Columbia.

**PARTIES AND RELEVANT PERSONS**

11. Plaintiff Elisabeth Best is an individual residing in the District of Columbia. Best is a consumer as defined by D.C. Code § 28-3091(a)(2). At all times relevant, Best was a tenant residing at the Property.

12. Plaintiff Jenna Bucklew is an individual residing in the District of Columbia. Bucklew is a consumer as defined by D.C. Code § 28-3091(a)(2). At all times relevant, Bucklew was a tenant residing at the Property.

13. Plaintiff Rachel Irias is an individual residing in the District of Columbia. Irias is a consumer as defined by D.C. Code § 28-3091(a)(2). At all times relevant, Irias was a tenant residing at the Property.

14. Plaintiff Cassandra Stephan is an individual residing in the District of Columbia.

Stephan is a consumer as defined by D.C. Code § 28-3091(a)(2). At all times relevant, Stephan was a tenant residing at the Property.

15. Defendant Second Nature Brands Inc. is a corporation organized in the state of Delaware with its principal place of business in North Carolina. Second Nature Brands Inc. is a merchant as defined by D.C. Code § 28-3091(a)(3) as it supplied the "Resident Benefits Package" to Plaintiffs and members of the Class, which is a "consumer good." Second Nature Brands Inc. is a housing provider as defined by D.C. Code § 42–3501.03 as it: (1) acted as an agent of the Landlord and Columbia Property Management (who in turn is a housing provider); and (2) received a benefit (the mandatory fee charged for the Resident Benefits Package) for the use or occupancy of the rental unit on the Property.

16. Defendant Second Nature Insurance Services, LLC is a limited liability company in the state of North Carolina with its principal place of business in North Carolina. Second Nature Insurance Services, LLC is a merchant as defined by D.C. Code § 28-3091(a)(3) as it supplied the "Resident Benefits Package" to Plaintiffs and members of the Class, which is a "consumer good." Second Nature Insurance Services, LLC is a housing provider as defined by D.C. Code § 42–3501.03 as it: (1) acted as an agent of the Landlord and Columbia Property Management (who in turn is a housing provider); and (2) received a benefit (the mandatory fee charged for the Resident Benefits Package) for the use or occupancy of the rental unit on the Property.

17. Defendant QBE Specialty Insurance Company ("QBE") is believed to be a corporation organized in the state of North Dakota with its principal place of business in Wisconsin. QBE is a merchant as defined by D.C. Code § 28-3091(a)(3) as it supplied the "Resident Benefits Package" to Plaintiffs and members of the Class, which is a "consumer good."

In addition, QBE is on the "supply side" of the "trade practice" supplying consumer goods and services, which includes the "Resident Benefits Package" and the insurance provided as part of the Resident Benefits Package. QBE is a housing provider as defined by D.C. Code § 42–3501.03 as it: (1) acted as an agent of the Landlord and Columbia Property Management (who in turn is a housing provider); and (2) received a benefit (the mandatory fee charged for the Resident Benefits Package) for the use or occupancy of the rental unit on the Property.

18. QBE provided the insurance policy to Second Nature as part of the "Resident Benefits Package." QBE was aware that Second Nature sold the Resident Benefits Package, as well as the insurance, to property managers and landlords as a way to obtain "ancillary revenue" through mandatory monthly fees billed to tenants. And although it was represented to the tenants that the Property Manager and Landlord Protection Policy was "Renter's Insurance," QBE knew that this was inaccurate. Nonetheless, QBE failed to disclose this material fact to the Class Members, as well as the terms of the insurance policy it issued on behalf of Second Nature to the Class Members.

19. Defendant Columbia Property Management, LLC is a limited liability company organized in the District of Columbia with its principal place of business in District of Columbia. Defendant Columbia Property Management, LLC is a citizen of the District of Columbia. Defendant Columbia Property Management, LLC is a merchant as defined by D.C. Code § 28-3091(a)(3) as it supplied the "Resident Benefits Package" to Plaintiffs and members of the Class, which is a "consumer good," as well as other property management services associated with "personal, [or] household…purposes." Columbia Property Management is a housing provider as defined by § 42–3501.03 as it acted as an agent of the Landlord and received a benefit for the use

Case 1:24-cv-03558-JMC Document 22 Filed 09/15/25 Page 43 of 87

or occupancy of the rental unit on the Property.

20. Defendant Scott Bloom is a citizen of the District of Columbia. Defendant Scott Bloom is a merchant as defined by D.C. Code § 28-3901(a)(3) as he supplied the "Resident Benefits Package" to Plaintiffs and members of the Class, which is a "consumer good," as well as other property management services associated with "personal, household…purposes." Defendant Bloom is liable for his own tortious and unlawful conduct, as well as participating in the tortious and unlawful conduct. Bloom is a housing provider as defined by § 42–3501.03 as he acted as an agent of the Landlord and received a benefit for the use or occupancy of the rental unit on the Property.

21. At all times relevant herein, Defendants operated as part of a joint venture with one another for the common purpose of bilking District of Columbia residents out of money through Second Nature's "Resident Benefits Package," which was marketed as providing "Renter's Insurance" through the QBE Defendants. Each of the Defendants had an equal right to control the manner in which the joint venture operated, including without limitation, providing so-called "Renter's Insurance" as one of the purported benefits to tenants, billing a monthly mandatory fee to the tenants, and determining which properties were eligible to be included under the Master Policy. Second Nature described the joint venture on its webpage, https://www.secondnature.com/benefits/renters-insurance . And on that webpage, it referred to the QBE Defendants as its "preferred insurance partner-broker…". Each of the Defendants profited from the mandatory monthly fee charged for the "Resident Benefits Package."

22. The Property is a "Housing Accommodation" as defined by D.C. § 42-3501.03. The Property is not exempt from rent control under D.C. Code § 42-3505.05, or any other provision of

law. *First*, the Landlord never submitted a completed, signed[1] "Claim of Exemption," which is required to apply for an exemption. While the Landlord registered the Property as a "Housing Accommodation" as required by law, it never submitted a "Claim of Exemption" with the Department of Housing and Community Development which is necessary to be an exempt property. *Second*, the Property is not eligible for exemption under D.C. Code § 42–3502.05 as the Property is not owned by a "natural person" but instead a trust. *Third*, neither the Landlord nor Columbia Property Management ever represented to the Plaintiffs that the Property was exempt, which would be required under the law if it were exempt (but it is not). *Fourth,* the Department of Housing and Community Development confirmed to Plaintiffs that the Property is not exempt.

23. At all times relevant, QBE and Second Nature were agents of the Landlord and/or Columbia Property Management. Specifically, Columbia Property Management: (1) selected Second Nature and QBE on behalf of the Landlord to provide insurance for the Property; (2) collected money from Plaintiffs, as well as members of the Class, through charging mandatory fees for the Resident Benefits Package, who then remitted the money charged from the fees to QBE and Second Nature; (3) had the power to terminate the relationship with QBE and Second Nature; and (4) had the power to negotiate and direct QBE and Second Nature to provide certain insurance services for the Property, albeit for the benefit of the Landlord and Columbia Property Management.

1 The "Claim of Exemption" application must be signed under oath or affirmation and contain the signature of each "natural" person having an interest, direct or indirect, in the housing accommodation.

## FACTS COMMON TO ALL COUNTS

**The Setup: "Ancillary Revenue" through the "Resident Benefits Package"**

24. This fraudulent scheme began, as frauds typically do, with the prospect of easy money. The easy money here is pitched by Second Nature as "Ancillary Revenue." Indeed, Second Nature maps out the entire scheme on its website. According to Second Nature:

> **Ancillary revenue opportunities**
>
> A tenant benefits package can create opportunities for generating additional revenue streams tied to specific benefits in the package.

25. Second Nature then provides guidance to property managers and landlords on how to obtain additional money from tenants apart from the monthly rent:



## What is Ancillary Revenue?

First, let's get down to brass tacks.

Ancillary revenue is any additional source of income generated by a property that is not directly related to its primary function or purpose. In property management, property managers offer additional services to generate additional income for themselves and their client investors beyond the rent or lease payments they receive from residents.

Most of us are familiar with ancillary revenue streams like those used in the airline industry or hotel industry. Companies may charge for early check-in, late check-out, in-flight entertainment, wifi etc. But what many of these programs miss is the opportunity to generate value without nickel-and-diming people.

Examples of ancillary revenue in property management can include things like pet fees, renter's insurance programs, management fees, and more. These compound to boost your total revenue alongside adding value for residents and investors. In some ways, you can think of it like an upsell, but it's really about value generation and finding a way to diversify revenue streams.

By diversifying their revenue streams, property managers can increase their income and offset some of the costs associated with maintaining the property.

And while Second Nature made it clear, "Ancillary Revenue" is similar fees that consumers are used to in the airline industry and hotel industry, they provided examples of these types of fees that can be charged to tenants by property managers:



KLAPROTH LAW PLLC
2300 WISCONSIN AVE NW SUITE 100A | WASHINGTON DC 20007
www.klaprothlaw.com

## Ancillary revenue stream examples in property management

Let's look at some of the most common and successful ancillary revenue examples. Ancillary programs work well for both multifamily and single-family rentals. You can break ancillary charges down into two categories: fees vs. special programs.

### Ancillary Fees

First, there's the ancillary fees approach. Those can include the following.

**Resident-Focused**

- Security Deposit Processing Fees
- Leasing or Lease Amendment Fees
- Paper Lease Setup Fees
- Lease Renewal Fees
- Renters Insurance
- Late Fees

**Investor-Focused**

- Inspection and Maintenance Monthly Fees
- Marketing Fees (social media, etc.)
- Insurance Risk Mitigation Fees
- Vendor Screening Fees
- Rent Protection or Eviction Fees

Ultimately, according to Second Nature, "[a]ncillary revenue is a huge profit driver for property management companies." *Id.* Second Nature stated:

> [t]here is a lot of money to be made in ancillary income in the property management industry and real estate industry. But many property managers don't even consider the wealth of opportunities to increase profit, grow your business, and increase the satisfaction of your residents that ancillary income opportunities provide

And Second Nature capitalized on these added fees charged to tenants by property managers by creating their "Resident Benefits Package," which Second Nature summarizes as follows:




26. Since the lawsuit was filed, Second Nature altered the above webpage in its entirety and deleted the eight references to the Resident Benefits Package as a way to generate "revenue" for property managers. *Id.* Indeed, archived versions of the webpage

(https://www.secondnature.com/blog/what-is-a-resident-benefits-package) clearly demonstrate Second Nature's potential spoliation of evidence after the filing of the lawsuit:

a. Website on April 6, 2024 –

https://web.archive.org/web/20240406002128/https://www.secondnature.com/blog/what-is-a-resident-benefits-package .

b. Website on May 14, 2024 –

https://web.archive.org/web/20240514191608/https://www.secondnature.com/blog/what-is-a-resident-benefits-package

27. This purging of evidence and post hoc attempt to camouflage the "resident benefits package" is only further evidence of Defendants' knowing violation of the law.

28. So, what is the Resident Benefits Package? Second Nature identifies a series of items it purportedly provides to the benefit of the tenant, but in actuality, the services are designed to protect the property manager and landlord and to increase their revenue. Each are listed below:

a. **Filter Delivery Service** – Although a landlord is required to service a HVAC system in the District of Columbia, Second Nature attempts to pawn this obligation off on the tenant. As part of the Resident Benefits Package, a tenant receives HVAC air filters to install themselves. And the benefit here is to the landlord and property manager. According to Second Nature, "[o]ne of the most common causes of HVAC maintenance requests is a failure to change the home's air filters on time," and so the air filter delivery services results in property managers having "fewer HVAC tickets to deal with, and the investor [a/k/a landlord] has their asset protected." Second Nature states, ""[o]ur filter delivery service has proven to reduce total HVAC maintenance requests by 38% and save up to $250 per year per property."

   **Defendants never even provided Plaintiffs with the HVAC air filters.**

b. **Credit Reporting** – Second Nature refers to this service as "Credit Building" for the tenant, but in actuality, Second Nature provides "credit reporting" on behalf of the landlord or property managers because they "both reap the benefit of the extra incentive to get rent on time" as this "service directly impacts rates

on credit cards, auto loans, and future mortgages, incentivizing residents to get rent in on time."

c. What they are pitching to the tenant under the guise as "Credit Building," is, in actuality, a way for the landlord to attack a tenant's credit if they are late with a rent payment. And the tenant gets billed for this so-called "benefit" that allows a landlord to attack a tenant's credit

d. **Resident Rewards Program** – This is an undefined service which is "designed to reward and encourage good habits." When a tenant makes a payment on time, they supposedly receive "Pinata Cash." Again, "Pinata Cash" is just another instrumentality of the fraud. According to Pinata, "Property owners and operators love Piñata® because the Piñata platform boosts your bottom line, increases revenue and attracts & retains top-tier renters." And as one tenant stated, "The 'third party rewards' company in my case is an app called Pinata, which is a TOTAL SCAM."

**e.** **Move-In Concierge** – According to Second Nature, the company provides a concierge service to guide the tenant in setting up utilities. The Plaintiffs were never provided with any information regarding this purported service, yet were required to provide account numbers for electric and gas utility accounts prior to receiving their keys, making such as a service moot.

**And it turns out, the "move-in concierge" is a free service provided online to anyone (not just to Resident Benefit Package Recipients) by Citizen Home Solutions, LLC,[2] which mines user data and receives kickbacks from cable and internet service providers**.[3]

**f.** **Renters Insurance** – Although the "renter's insurance" was pitched as a benefit to the tenant,[4] it was actually a policy written to protect the property manager

2 https://www.movewithcitizen.com/

3 https://www.movewithcitizen.com/resident/privacy-policy ("We may share the following types of Personal Information with one or more Service Providers: unique identifiers; contact information; commercial information; financial information; audio/visual information; Internet and network information; content of correspondence; inferences drawn from the foregoing categories of Personal Information.")

4 The flyer published by Second Nature and Columbia Property Management states, "We've secured the industry-leading value policy from an A-rated carrier. You'll benefit by being added to our master policy so all of your insurance requirements in the lease are met."

and landlord. The name of the policy, Property Manager and Landlord Protection Policy, itself demonstrates the intended beneficiary of the policy. But neither the policy, nor any information pertaining to the policy were ever disclosed to the tenants. In advertising the insurance program, Second Nature stated, "We've got you covered – Our renter's insurance program ensures 100% compliance and liability coverage protecting you, your property investors, and your residents." **"You" in the preceding sentence refers to the property manager, not the tenant.**

The Resident Benefits Package Lease Addendum (which was not attached to the lease and sent by Defendant Bloom on September 2, 2023), states that the "Landlord requires Tenant obtain liability coverage of at least $100,000 in property damage and legal liability from an A-rated carrier and to maintain such coverage throughout the entire term of the lease agreement." **This is false. No such requirement existed in the lease**. This was a false representation to try justify the fee charged for the Resident Benefit Package. Moreover, the statement is also false because the RBP did not provide $100,000 in property damage coverage.

The insurance was provided by QBE.

**The Hook: The RBP and the Associated Fees are Mandatory**

29. Why would a tenant agree to pay a monthly fee for a Resident Benefits Package, which provides no actual benefit? Second Nature instructs its property managers to give the tenant ***no option*** by making the fee mandatory. Second Nature devotes an entire webpage explaining why the Resident Benefits Package fees must be mandatory.

30. *First*, Second Nature explains that tenants should not have a choice because this is "something they want." So, Second Natures takes it upon themselves to decide for the tenants, what a tenant wants, and it unilaterally decided that tenants want to be charged additional fees. Nonsense. A basic google search will yield hundreds of complaints from tenants across the District

---

In its term sheet, Columbia Property Management referred to the insurance as the "renter's insurance" even though it was really a "Property Manager and Landlord Protection Policy."

of Columbia, and the country, complaining that the Resident Benefits Package is a scam. A few are below:

r/washingtondc • 9 mo. ago
gross666

### Is a mandatory 'residents benefit fee' legit?

Trying to renew our group house lease, and the property management company (RPM) has hit us with a new clause in the lease for a mandatory 'residents benefits package'. The package would be 50 bucks a month, and is not included in our separately raised rent.

Is this a legit thing in DC that we should pay for without fighting? I have never heard of it before but want to check

Or do folks have recommendations for how to remove this from the lease and still have them fulfill their duty of maintaining the property?

To us this seems very sketchy... why are we paying 50 a month for them to continue to service our maintenance requests like they have been doing? Is this legal to be mandatory? And why are we paying it and not the homeowner who contracts them?

They are trying to upsell us on other benefits that also don't really fly:

- piñata cash rewards program (??)
- providing a furnace filter monthly (we don't have a furnace)
- a discount if we use them to buy a house
- landlord verification (??)
- putting our security deposit in obligo (??)

Ty for any advice!!

**gross666** OP • 9mo ago

Oof this is absolutely Real Property Management! Thank u for replying!! Sucks so much that they started doing this, literally squeezing money out of tenants who are already living in the space :(( Insanely unethical that they don't have a fee free way to pay rent, and this seems like a new practice as it was not the case when we signed initially in 2021.

Were you able to confirm with folks in DC gov that this is legal? If so it seems like we should just sign ://

5 Reply Share ···

**RipFamiliar9069** • 5mo ago

Oh how I wish this were the case in CA...Property Management companies are all jumping on this kind of thing. I recently moved to a new place and had to pay for this same "benefits package" in CA. They also try to force you into using their renter's insurance. What's even worse is that some of these companies are even sticking the renters with paying for a "surcharge" for city utilities (water/sewer/trash) "to help the owner." It's like rent is overinflated in every market...renters pay for all utilities and even things that SHOULD be considered normal wear and tear.

1 Reply Share ···

**GlassDependent6253** • 5mo ago

I work in the Property Management field and I agree with everyone who says the Resident Benefits Package is bs. The only parties it benefits are the PM companies and the RBP company. There was a bill last year to make them illegal but whoever was in charge ran out of time to get it on the ballot. I have my fingers crossed that it will get passed eventually.

1 Share ···

31. *Second*, Second Nature explains that Tenants should be charged a mandatory fee because they "rarely give pushback." This is just another way of Second Nature saying, "you can steal from your tenants and get away with it."

32. *Finally*, Second Nature claims that the primary reason for making the fee mandatory is that "optional rollouts create unnecessary headaches" for a property manager. In other words, it creates additional work for a property manager to do the accounting to track which of its tenants it is defrauding if the fees were optional.

**The Seeds are Planted: Columbia Property Management Requires all Tenants to Pay $45.95 for the Resident Benefits Package offered by Second Nature**

33. Columbia Property Management and Bloom bought into Second Nature's idea of free money, or as they referred to it, "Ancillary Revenue."

34. Accordingly, Columbia Property Management and Bloom require that all tenants at each of the properties they manage pay a mandatory monthly fee of $45.95 for a Resident Benefits Package. Each listing for each of the properties includes the following language:

> All Columbia Property Management residents are enrolled in the Resident Benefits Package (RBP) for $45.95/month which includes: renters insurance, move-in concierge service for utility and home services set-up, AC and heating air filter delivery to your door, our best-in-class resident rewards program, credit building to help boost your credit score, $1Million policy for Identity Protection and much more! The first month's rent and a security deposit equal to one month's rent are due before moving in. More details upon application.

And as we now know, the so-called "renters insurance" referred to in the listing is a misrepresentation as the actual insurance is actually a "Property Manager and Landlord Protection Policy."

35. Upon information and belief, for each of the listings, Columbia Property Management and Bloom also provide a "Terms Sheet" which states:

> **Resident Benefits Package**
> All Columbia Property Management residents are enrolled in the Resident Benefits Package (RBP) for $45.95/month which includes: renter's insurance, move-in concierge service for utility and home services set-up, AC and heating air filter delivery to your door, our best-in-class resident rewards program, credit building to help boost your credit score, $1Million policy for Identity Protection and much more! More details upon application.

Again, this too misrepresents the insurance as being "renter's insurance".

**The Fraudulent Scheme is Uncovered**

36. In the case of the Plaintiffs, they applied to rent the Property at the end of May

2023.

37. On May 30, 2023, Columbia Property Management provided Plaintiffs with a "sample lease" that made no mention of the Resident Benefits Package, or any fees associated with it.

38. On May 31, 2023, Columbia Property Management "conditionally approved" the application, subject to a criminal background check and Plaintiffs submitting the first month's rent and fees within three business days. Without any explanation, Columbia Property Management attached to the "conditional approval" email, a document titled, "RBP CPM Flyer_010623." A screenshot of the flyer is below:




39. The flyer contained no information about the mandatory fee for the "Resident Benefit Package" but instead misrepresented it as "Benefits so good, you may never want to leave." The flyer also contained numerous misrepresentations about "Renter's Insurance," as well as various other aspects of the "Resident Benefits Package." Further, the flyer contained the false

testimonial: "I'm getting way more out of renting than I ever did before" -Helen S. And we know this is false, because although this is a Columbia Property Management flyer, an identical flyer published by Real Property Management: DC Metro contains the same testimonial.

40. On May 31, 2023, Columbia Property Management notified Plaintiffs they received "final approval for the application" for the property.

41. On June 1, 2023, Columbia Property Management sent the lease to the Plaintiffs through an electronic signature program called BlueInk. In the body of the email, Columbia Property Management wrote, "I have drafted this lease along with the Resident Benefit Packet Addendum for your review and signature." The "Resident Benefit Packet Addendum" was not, however, attached to the Lease or provided to the Plaintiffs at this time.

42. By June 5, 2023, all the Plaintiffs executed the Lease. Scott Bloom executed the lease on behalf of the Landlord on June 2, 2023. The Lease contained no information concerning a mandatory monthly fee of $49.95 or any information relating to a Resident Benefits Package. Columbia Property Management wrote into the lease in the "Additional Provisions" Section at the end of the Lease, that "Tenant Acknowledges that attached documents form part of this Lease: Appendix A, Appendix B, and the CPM Resident Handbook." But these documents were not attached to the lease, nor were they provided to Plaintiffs at this time. Plaintiffs have no records containing signed copies of the document and were not able to locate any such document on BlueInk.

43. On June 13, 2023, Columbia Property Management provided Plaintiffs with a fully

executed copy of the Lease, which did not contain Appendix A, Appendix B, or the CPM Resident Handbook. In addition, the fully executed lease provided to the Plaintiffs did not include any information concerning the "Resident Benefits Package."

44. Despite not agreeing to the Resident Benefits Package, nor being provided with any information regarding the terms of it, Defendants charged Plaintiffs $45.95 for the Resident Benefits Package on June 26, 2023, July 30, 2023, and August 27, 2023. In addition to the mandatory fee of $45.95, Defendants also charged a "service fee" of $2.95.

45. Immediately after moving into the Property, the Plaintiffs experienced water leaks in the Property and electrical shorting. According to Columbia Property Management, the water leaks were causing the electrical shorting. On August 24, 2023, Ms. Stephan complained to Columbia Property Management, "Should we be worried that the electric is shorting and they [GFCI outlets and breakers] aren't going off?"

46. On August 28, 2023, the Property caught on fire due to the electrical issues that had been unaddressed by the Landlord or Columbia Property Management, resulting in Plaintiffs' property being destroyed and them being without a place to live.

47. On August 29, 2023, Plaintiffs attempted to open an insurance claim with Columbia Property Management for the "Renter's Insurance," included as part of the Resident Benefits Package. Columbia Property Management redirected Plaintiffs to Second Nature. This is the first they learned of Second Nature's involvement with respect to the so-called "Renter's Insurance." Second Nature told Plaintiffs that a claim had been "submitted to the carrier" and was redirected with any questions to "QBE Claims: 844-723-2524." This was the first time that Plaintiffs had knowledge of QBE's involvement with the so-called "Renter's Insurance" provided as part of the

Resident Benefits Package. At this time, Plaintiffs still have never been provided with a copy of any insurance policy for the "Renter's Insurance."

48. Without any answers concerning the insurance coverage under the "Renter's Insurance," Plaintiffs turned to Scott Bloom and Columbia Property Management for some answers. Backpedaling, on September 2, 2023, Bloom provided a chronology of their purported disclosures concerning the Resident Benefits Package, which include the language in the rental listing and term sheet referenced above. Bloom further attached "Appendix B," which he stated "is one of the documents that goes out and is signed" at the time of the lease and it "gives additional information on how the RBP program works and more details about each benefit in the program." Notably, "Appendix B" provided by Bloom was unsigned by Plaintiffs.[5] Importantly, Bloom stated in the email, "I wanted to also send you the documents we located related to the information you asked about, specifically ***about the manner in which we offered the insurance***." (emphasis added). Neither Scott Bloom nor Columbia Property Management were licensed to offer or sell insurance in the District of Columbia.

49. Appendix B provided by Bloom on September 2, 2023, stated that the "Tenant" could purchase an insurance policy other than the insurance provided as part of the Resident Benefit's Package, and the "Resident Benefits Package" monthly amount will be adjusted accordingly. Two conclusions can be drawn from this: (1) the mandatory fee would be charged no matter what, even if the Plaintiffs, or Class Members, purchased their own insurance policy; and (2) QBE received a portion of the mandatory fee charged by Defendants for the "Resident Benefits

5 Plaintiffs have no records containing signed copies of the document and were not able to locate any such document on BlueInk.

Package" for the insurance premium which explains why the mandatory fee would "be adjusted accordingly" if the tenant purchased his/her own insurance policy.

50. In addition, the first time Plaintiffs received a copy of what they believed to be their "Renter's Insurance" was October 11, 2023. At this time, they learned that it was actually a "Property Manager and Landlord Protection Policy," which primarily provided coverage for the Landlord and Columbia Property Management. The insured listed on the policy was not one of the Plaintiffs, but instead Second Nature. They also learned that the "Property Manager and Landlord Protection Policy" was issued by QBE and the policy was "written in the name of Property Managers, Owners, Distribution Partners, Agencies, rather than the resident like an H04 policy." This Property Manager and Landlord Policy, which they had been paying for, only provided $10,000 of coverage for all four Plaintiffs' personal property, or rather, $2,500 per individual. Their losses vastly exceeded the limits of coverage. While on the other hand, the policy provided property damage coverage to the Landlord and property manager in the amount of $100,000, as well as loss of rental income coverage. In other words, Columbia Property Management and Bloom, had been billing the Plaintiffs for insurance coverage for Columbia Property Management and the Landlord. Had Plaintiffs known about the limited insurance coverage provided under the Property Manager and Landlord Protection Policy or been provided with a copy of the Policy, they would have purchased an actual renter's insurance policy that provided adequate coverage for their personal property.

**CLASS ACTION ALLEGATIONS**

51. Plaintiffs seek to bring this case as a class action on behalf of themselves and all other tenants in the District of Columbia charged a mandatory fee by any of the Defendants.

52. The class shall be defined as residential tenants in the District of Columbia residing in rental units that are not exempt from rent control and who were charged fees by Defendants for a Resident Benefits Package, for insurance, or any other service. The class shall include the following subclasses:

a. All tenants in the District of Columbia charged a fee by Columbia Property Management and/or Scott Bloom for a "Resident Benefits Package"; and,

b. All tenants in the District of Columbia charged a fee for a "Resident Benefits Package" provided by Second Nature.

53. The proposed class is so numerous that joinder of all members is impractical. According to Columbia Property Management, it manages hundreds of properties for "100 or so clients", and all the tenants at those properties are charged a mandatory fee for the Resident Benefits Package. Indeed, every one of its listings states that the monthly fee for the Resident Benefits Package is mandatory.

54. In addition, Second Nature provides Resident Benefits Packages to District of Columbia tenants through property managers other than Columbia Property Management, including without limitation: EFJ Rentals, Real Property Management: DC Metro, and Bay Property Management Group.

55. There are common questions of law and fact common to the class because all of the properties managed by Columbia Property Management charge a mandatory fee for the "Resident Benefits Package," in violation of D.C. Code § 42–3502.11a. The "Resident Benefits Package" is provided by Second Nature and the corresponding insurance is provided by the QBE.

56. In addition, Defendants violated the CPPA by violating D.C. Code § 42–3502.11a and D.C. Code § 31-1131.03, as well by violating D.C. Code § 28-3904 by mispresenting the

Case 1:24-cv-03517-JMC Document 1-2 Filed 09/13/24 Page 26 of 36

Resident Benefits Package, as well as the insurance provided as part of the Resident Benefits Package.

57. Defendants' scheme to bilk D.C. tenants out of their money through unlawful mandatory fees, as well as misrepresentations regarding the Resident Benefits Package, was common to all D.C. tenants that were charged fees for a Resident Benefits Package. Accordingly, the unlawful fees charged to Plaintiffs, and consumer fraud perpetuated against Plaintiffs, is typical and representative, of the unlawful fees charged to, and misrepresentations made to, members of the class.

58. Plaintiffs can, and will, adequately represent the interests of the class because Plaintiffs are similarly situated with and have suffered similar injuries as the members of the class they seek to represent. Plaintiffs have no interests that conflict with or that are antagonistic to the interests of the entire class. Plaintiffs have retained Brendan Klaproth of Klaproth Law PLLC who is competent to represent the Class and will vigorously prosecute this litigation.

59. A class action is superior to any other available method for the fair and efficient adjudication of the controversy because:

a. Common questions of law and fact predominate over any individual questions that may arise, because all claims involve Defendants charging unlawful mandatory fees to tenants in the District of Columbia, and the same unlawful trade practices in violation of the D.C. Consumer Protection Procedures Act.

b. No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

c. Upon information and belief, there are no pending lawsuits concerning this controversy.

d. It is desirable to concentrate the litigation of these claims in this forum since the acts complained of took place in the District of Columbia, involves claims brought on behalf of D.C. tenants, and this forum is convenient to the parties,

the class members, and potential witnesses. The resolution of the claims of all class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

e. The prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, and adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests.

f. This class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action. Indeed, Defendants records will show which tenants were charged the mandatory fees associated with the Resident Benefits Package.

g. Resolution of class members' claims in this single class action is superior to resolution of this controversy through the filing of a host of individual actions as a matter of efficiency, consistency and in that it removes economic and other barriers to class members pursuing their claims. Absent this class action, class members will not likely obtain redress of their injuries and Defendants would retain the proceeds of their violations of the laws of the District of Columbia.

**COUNT I**
**VIOLATION OF D.C. CODE § 42-3502.11a**

60. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

61. Under D.C. Code § 42-3502.11a, "[a] housing provider shall not impose on a tenant a mandatory fee for a service or facility that has not been approved pursuant to § 42-3502.11 or § 42-3502.15." Furthermore, "a housing provider who violates this section shall be liable to the tenant for treble damages pursuant to section 901(a)."

62. Defendants violated D.C. Code § 42-3502.11a by charging a mandatory fee for the Resident Benefits Package, which had not "been approved under § 42-3502.11 or § 42-3502.15."

63. QBE and Second Nature are directly liable under D.C. Code § 42-3502.11a. QBE

and Second Nature are also vicariously liable under D.C. Code § 42-3502.11a as they are agents of Columbia Property Management. for aiding and abetting Columbia Property Management, as well as conspiring with Columbia Property Management, to charge a mandatory fee in violation of D.C. Code § 42-3502.11a. The overt acts by QBE include, without limitation, issuing a "Property Manager and Landlord Protection Policy" to Second Nature as part of the Resident Benefits Package, which was falsely marketed as a "Renter's Insurance" policy. The insurance policy issued by QBE was an instrumentality of the fraud perpetuated by Defendants to defraud tenants out of money through mandatory fees. The overt acts by Second Nature include all of the marketing materials published on its website, including without limitation, those referenced in Paragraphs 24-32 above. These marketing materials were published to induce property managers, such as Columbia Property Management, to violate D.C. Code § 42-3502.11a. The overt acts by Second Nature further include, without limitation, providing and administering the Resident Benefits Package, which served as the basis to charge the mandatory monthly fee.

64. In addition, QBE and Second Nature are further liable under D.C. Code § 42-3502.11a as they operated as part of a joint venture with Columbia Property Management. Defendants operated as part of a joint venture with one another for the common purpose of defrauding District of Columbia residents out of money through Second Nature's "Resident Benefits Package," which was marketed as providing "Renter's Insurance" through QBE. Each of the Defendants had an equal right to control the manner in which the joint venture operated, including without limitation, providing so-called "Renter's Insurance" as one of the purported benefits to tenants, billing a monthly mandatory fee to the tenants, and determining which properties were eligible to be included under the Master Policy. Second Nature described the joint

venture on its webpage, https://www.secondnature.com/benefits/renters-insurance. And on that webpage, it referred to QBE as its "preferred insurance partner-broker…".

65. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief in the form of a judgment against Defendants: (1) awarding compensatory damages; (2) awarding treble damages; (3) awarding costs and attorney's fees; (4) awarding punitive damages; (4) declaring mandatory fees charged for the Resident Benefits Package to be unlawful; (5) permanently enjoining Defendants from charging fees for the Resident Benefits Package, or any other service not approved under D.C. Code § 42-3502.11 or § 42-3502.15; (6) disgorging all amounts received by Defendants in connection with the Resident Benefits Package; and (7) any other relief the Court deems proper.

**COUNT II**
**UNLAWFUL TRADE PRACTICES UNDER THE**
**D.C. CONSUME PROTECTION PROCEDURES ACT**

66. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this First Complaint as if fully set forth herein.

67. Under the CPPA it is an unlawful trade practice to violate other statutes and regulations. Defendants violated the CPPA by violating: (1) D.C. Code § 42-3502.11a; and (2) D.C. Code § 31-1131.03. As stated above, (1) D.C. Code § 42-3502.11a prohibits a housing provider from charging mandatory fees, such as the Resident Benefits Package fee charged to Plaintiffs. In addition, D.C. Code § 31-1131.03 prohibits a person from selling insurance without a license to do so. Neither Defendants Second Nature Brands Inc., Columbia Property Management, nor Scott Bloom were licensed to sell insurance on behalf of QBE.

68. Defendants committed an unlawful trade practice in violation of D.C. Code § 28-

3904(e) and/or 3904(f) when they made the following misrepresentations and/or omissions of material fact that have a tendency to mislead:

a. Misrepresenting that the "Resident Benefits Package" included "Renter's Insurance" when it was actually a "Property Manager and Landlord Protection Policy." This misrepresentation was contained in the Terms Sheet and Flyer disseminated by Defendants, the emails sent by Columbia Property Management, oral representations, and was never disclosed by QBE;

b. Misrepresenting, "We've got you covered – Our renter's insurance program ensures 100% compliance and liability coverage protecting you, your property investors, and your residents";

c. Misrepresenting that the "Resident Benefits Package" benefitted tenants when it did not and was instead designed to obtain "ancillary revenue" from tenants through bogus mandatory fees;

d. Misrepresenting that the "Resident Benefits Package" provided value to tenants when it did not;

e. Misrepresenting that Defendants could impose a mandatory fee, when they could not;

f. Misrepresenting that the "move-in concierge service" had value when it did not; and instead, was a publicly available free service provided Citizen Home Solutions, LLC, which mines user data and receives kickbacks from cable and internet service providers;

g. Misrepresenting that the HVAC filter service benefitted tenants when it actually benefited landlords and property managers as HVAC maintenance is a landlord obligation under the D.C. law;

h. Misrepresenting that the "Resident Rewards Program" administered by Pinata had value to tenants when it did not;

i. Misrepresenting that the credit reporting was "credit building" for the tenant, but in actuality credit reporting as a threat to "incentiviz[e] residents to get rent in on time;

j. Misrepresenting fictious testimonials as real testimonials in their marketing materials;

k. Misrepresenting that the "online portal" was a benefit to the tenant when it was actually a way to pawn a property manager's overhead expenses;

l. Misrepresenting that the tenants were required under the lease to provide insurance for the landlord, when they were not;

m. Misrepresenting that tenants would receive HVAC filters as part of the "Resident Benefits Package", when they did not;

n. Misrepresenting that each individual tenant received "Renter's Insurance" when in fact QBE only provided $10,000 for the "insured location" regardless of how many tenants resided there;

o. Failing to disclose the terms of the "Renter's Insurance" to tenants;

p. Failing to provide a copy of the "Property Manager and Landlord Protection Policy" to the tenants;

q. Failing to disclose that the "Renter Insurance" was actually a "Property Manager and Landlord Protection Policy";

r. Failing to disclose that Second Nature Second Nature Brands Inc was not licensed to sell insurance; and,

s. Failing to disclose that Columbia Property Management was not licensed to sell insurance.

69. QBE was responsible for each of the misrepresentations contained in paragraph 68 by failing to disclose the material fact that the insurance it provided was in fact a "Property Manager and Landlord Protection Policy" rather than a renter's insurance policy; that the insurance did not provide insurance to each of the tenants, but instead to an "insured location"; the cost of the insurance; whether the insurance was in fact mandatory; their affiliation with Second Nature and/or Columbia Property Management; the terms of the insurance policy; falsely advertising the insurance provided by QBE; misrepresenting the benefits, advantages, conditions or terms of a policy; using a title of a policy to misrepresent the true nature of the policy; failing to disclose the cost of the premiums of the policy; and having unlicensed individuals and/or companies to sell QBE's insurance on behalf of QBE. Indeed, had a QBE insurance agent

advertised the Property Manager and Landlord Policy as a renter's policy to tenants, it would be fraud. It is no different for QBE to instead have its agents, Second Nature and Columbia Property Management, misrepresent the "Property Manager and Landlord Protection Policy" as a renter's insurance policy, when it is not.

70. In addition, QBE committed an unlawful trade practice in violation of D.C. Code § 28-3904(e) and/or 3904(f) (in addition to those set forth in Paragraphs 68 and 69) by:

a. QBE actively participated in the Defendants' deceptive scheme by knowingly issuing and underwriting the "Property Manager and Landlord Protection Policy" that was falsely marketed to tenants as "Renter's Insurance." QBE was aware that this misrepresentation would likely mislead consumers and induce them to enroll in the Resident Benefits Package.

b. QBE failed to disclose material information to Plaintiffs and the Class members regarding the true nature and limitations of the insurance coverage. QBE knew or should have known that the Policy primarily benefited the landlords and property managers, not the tenants, and that this omission would significantly impact consumers' decision-making.

c. QBE directly profited from the Defendants' deceptive practices by collecting insurance premiums as part of the mandatory Resident Benefits Package fee. QBE's financial gain was inextricably linked to the misrepresentations and omissions that induced Plaintiffs and the Class members to enroll in the program.

d. QBE enabled Defendants Second Nature Brands Inc. and Columbia Property Management to engage in unlicensed insurance sales by allowing them to market and administer the "Property Manager and Landlord Protection Policy" as part of the Resident Benefits Package. QBE's complicity in this unlawful conduct further establishes its liability under the CPPA.

71. But for the misrepresentations and omissions set forth in Paragraphs 68-70, Plaintiffs would not have rented the Property. Had Plaintiffs been informed as to the terms of the insurance provided by QBE, the Resident Benefits Package, and the illegal fees charged for the Resident Benefits Package, they would not have rented the Property.

72. Under the CPPA, it is an unlawful trade practice to represent that goods or services have approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have. See D.C. Code § 28-3904(a). Defendants committed an unlawful trade practice in violation of D.C. Code § 28-3904(a) as set forth in paragraphs 68(a)-(r), 69, and 70. But for these misrepresentations, Plaintiff would not have rented the Property.

73. Under the CPPA, it is an unlawful trade practice to represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. See D.C. Code § 28-3904(e-1). Defendants violated D.C. Code § 28-3904(e-1) by charging mandatory fees that were prohibited by law, misrepresenting that Plaintiffs were receiving "Renter's Insurance" when they were not, and misrepresenting the other illusory benefits contained in the Resident Benefits Package. Had Plaintiffs been fully informed that they would be charged mandatory fees for a Resident Benefits Package offering these illusory benefits, they would not have rented the Property.

74. Defendants violated D.C. Code § 28-3904(k) by falsely representing that insurance was required under the Lease for the Landlord when it was not and by falsely representing that the Resident Benefits Package was mandatory when it was not. But for these misrepresentations, Plaintiffs would not have rented the Property and/or would have obtained their insurance coverage.

75. Defendants violated D.C. Code § 28-3904(q) by failing to provide Plaintiffs with a copy of the Policy. Had Plaintiffs received a copy of the insurance policy, they would not have rented the Property and/or would have obtained a separate insurance policy to ensure they were adequately insured.

76. Defendants violated D.C. Code § 28-3904(v) by misrepresenting that Defendants

Case 1:24-cv-03557-JMC Document 24-2 Filed 09/15/25 Page 34 of 87

Second Nature, Columbia Property Management, and Bloom had the authority to sell insurance when they did not.

77. Ultimately, Plaintiffs were sold a package of services billed as the Resident Benefits Package. They rented the Property believing, based on Defendants' misrepresentation, that they would receive these so-called benefits and save money by not having to get a renter's insurance policy, because this was included as part of the Resident Benefits Package. At bottom, Plaintiffs were sold services they did not receive nor were required to pay for. They were injured.

78. Furthermore, Defendants unlawful conduct and misrepresentations deprived Plaintiffs and the Class members of their right to make informed choices about their housing and insurance needs. The misrepresentations and omissions regarding the Resident Benefits Package and its mandatory nature interfered with their ability to negotiate lease terms, compare options in the marketplace, and obtain necessary renter's insurance, causing a concrete injury.

79. In addition, Plaintiffs and the Class Members suffered a concrete economic injury by overpaying for the Resident Benefits Package, as well as insurance, due to the Defendants' misrepresentations. The insurance policy, falsely advertised as "Renter's Insurance," provided inadequate coverage for their personal property which they overpaid for, leaving them exposed to significant financial losses in the event of damage or loss, as tragically exemplified by the fire at the Property.

80. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief in the form of a judgment against Defendants jointly and severally: (1) awarding $1,500 per violation of the CPPA, (2) awarding compensatory damages; (3) awarding treble damages; (4) awarding costs and attorney's fees; (5) awarding punitive damages; (6) declaring

mandatory fees charged for the Resident Benefits Package to be unlawful; (6) permanently enjoining Defendants from charging fees for the Resident Benefits Package, or any other service not approved under D.C. Code § 42-3502.11 or § 42-3502.15; (7) disgorging all amounts received by Defendants in connection with the Resident Benefits Package; and (8) any other relief the Court deems proper.

**PRAYER FOR RELIEF**

81. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief in the form of a judgment against Defendants, jointly and severally: (1) awarding $1,500 per violation of the CPPA, (2) awarding compensatory damages; (3) awarding treble damages; (4) awarding costs and attorney's fees; (5) awarding punitive damages; (6) declaring mandatory fees charged for the Resident Benefits Package to be unlawful; (6) permanently enjoining Defendants from charging fees for the Resident Benefits Package, or any other service not approved under D.C. Code § 42-3502.11 or § 42-3502.15; (7) disgorging all amounts received by Defendants in connection with the Resident Benefits Package; and (8) any other relief the Court deems proper.

**JURY AND TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury with respect to each claim in this First Amended Complaint.

Respectfully submitted,

*/s/ Brendan J. Klaproth*
Brendan J. Klaproth (D.C. Bar No. 999360)
Jesse C. Klaproth (D.C. Bar No. 90009387)
Klaproth Law PLLC
2300 Wisconsin Ave NW

Suite 100A
Washington, DC 20007
Tel: 202-618-2344
Email: bklaproth@klaprothlaw.com
Email: jklaproth@klaprothlaw.com
*Attorneys for Plaintiffs*

# Exhibit 3

LRD
LAVIN RINDNER DUFFIELD LLC

Marc E. Rindner
912.266.8302
mrindner@lrd.law

Andrew G. Lipton
912.266.8306
alipton@lrd.law

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT**

July 8, 2024

Kimberly Godsey, Esq.
VP of Legal Compliance
333 Fayetteville Street, Suite 1470
Raleigh, NC 27601
E: legal@secondnature.com

| | |
|---|---|
| Re: Insured: | Second Nature Brands, Inc. |
| Policy No.: | S0004PL00191000 |
| Matter: | *Elizabeth Best, et al. v. Second Nature Brands, Inc. et al.,* Case No. 1:24-cv-01799 (D.D.C.) |
| Claim No.: | 28-023880 |

Dear Ms. Godsey:

We represent Accelerant Specialty Insurance Company ("Accelerant"), which issued Professional Liability Insurance Policy No. S0004PL00191000 to Second Nature Brands, Inc. ("Second Nature Brands") for the **policy period** of May 2, 2023 to July 1, 2024 (the "Policy") (terms in bold are defined in the Policy). In this capacity, we write to follow up on your prior communication with Tim de Koekkoek of Premier Claims Management LLC – which serves as the third-party administrator for Accelerant here – and to provide you with our client's assessment of the availability of coverage for the referenced matter (the "*Best* action"). Regrettably, we must advise you that Accelerant has determined that the Policy does not provide any coverage for the **claim**. The bases for this conclusion are set forth below.

## I. Background

The *Best* action initially was filed in the Superior Court for the District of Columbia on April 29, 2024, and then removed to the United States District Court for the District of Columbia on June 21, 2024. The case is brought as a putative class action by Elizabeth Best, Jenna Bucklew, Rachel Irias and Cassandra Stephan and names as defendants Second Nature Brands and Second Nature Insurance Services LLC ("SNIS") (together, "Second Nature"), along with one individual and several other entities.

According to the complaint, Second Nature set up a "fraudulent scheme," creating a program for landlords and property managers that allows them to charge tenants mandatory fees in addition to monthly rent. Second Nature allegedly designed the program to provide an "ancillary revenue opportunity" to the landlords and property managers, enabling them to effectively push the costs of maintaining their properties to the tenants. The complaint alleges that the program involves a "resident benefits package," for which tenants are required to pay mandatory fees to cover insurance, HVAC filters and access to an online portal to pay rent. The complaint further alleges that the package does not actually benefit or provide any value to the residents, noting among other things, that the insurance covered the landlords

and property managers and that HVAC are the responsibility of the landlord under District of Columbia law (and, in any event, were never provided to plaintiffs).

As to the insurance, in particular, plaintiffs allege that they leased the property located at 1934 1st Street, NW, Washington, DC, which burned down on August 28, 2023. They allegedly had been enrolled in the resident benefits package offered by Second Nature, for which they were charged $45.95 per month. Plaintiffs allege that after the fire, they submitted an insurance claim and learned for the first time that the insurance provided through the benefits package "was not actually renter's insurance as had been represented to them," but rather a landlord/property management protection policy that included $10,000 of coverage for personal property. Plaintiffs contend that because defendants had represented to them that the resident benefits package included renter's insurance, they did not obtain a separate renter's insurance policy to cover their personal belongings.

The complaint asserts a cause of action against all defendants for violation of D.C. Code § 42-350211a, which prohibits a housing provider from imposing unapproved mandatory service fees. As to Second Nature, plaintiffs contend that Second Nature is directly liable under the statute and vicariously liable for enabling, aiding and abetting the landlords and property managers in violating the statute. The complaint also asserts a cause of action against all defendants for unlawful trade practices under the District of Columbia Consumer Protection Procedures Act ("DCCPA").

For relief, plaintiffs seek on behalf of themselves and other similarly situated residential tenants unspecified compensatory damages, statutory damages, trebled damages, punitive damages and fees and costs, as well as certain injunctive relief.

## II. Coverage Discussion

### A. Absent an allegation of negligent conduct, coverage is not triggered.

As set forth in the Policy's sole insuring agreement, coverage is limited to **damages** and **claims expenses** on account of a **claim** against an **insured** – that is, Second Nature – "alleging a negligent act, error or omission" in the performance of **professional services** on or after the **retroactive date**.[1] *See* Policy, Section II.

The Policy defines **claim** to include a written assertion of liability or a written demand for compensation. *See* Policy, Section X.E. **Professional services** means "residents' concierge services" provided by an **insured** to a third party for a fee or other consideration. *See* Policy, Declarations, Item 9, and Section X.

The *Best* action, along with its complaint asserting that Second Nature is liable for monetary damages, is a **claim**. Moreover, to the extent that the allegations against Second Nature in putting together, marketing

[1] Second Nature Brands, as the **named insured** identified in Item 1 of the Declarations, is an **insured**. *See* Policy, Section X.L. Accelerant understands that SNIS is a wholly-owned subsidiary of Second Nature Brands. As such, SNIS is a **subsidiary**, and therefore, an **insured** as well. *See* Policy, Section X.L. and X. None of the other named defendants in the *Best* action is an **insured** or otherwise covered under the Policy.

LRD

and administrating the resident benefits package at issue is a concierge service for residents provided to a third party for a fee, the allegations concern **professional services**.[2]

Nonetheless, coverage is not triggered because the *Best* action does not allege or seek relief on account of any negligent act, error or omission by Second Nature. Rather, the *Best* action involves only allegations against Second Nature of intentional and fraudulent conduct. As noted above, plaintiffs contend that Second Nature devised a "fraudulent scheme" to provide landlords and property managers with the ability to charge impermissible and unlawful ancillary fees to their tenants. Moreover, the complaint alleges that Second Nature "conspired" with the other defendants to defraud tenants and "operated as part of a joint venture with one another for the common purpose of bilking District of Columbia residents out of money." These allegations are outside the scope of the insuring agreement, and therefore the Policy does not respond to the **claim**.

**B. Coverage is barred by Exclusion 1.**

In addition, coverage for the *Best* action is barred by Exclusion 1. This provision provides that there is no coverage available under the Policy for any **claim**

> [b]ased upon or arising out of any actual or alleged . . . false, deceptive or unfair trade practices, . . . or . . . deceptive or misleading advertising.

*See* Policy, Section VI.B.1.

Here, the complaint alleges that Second Nature crafted the resident benefits package for the purpose of allowing landlords and property managers to defraud their tenants and charge them impermissible fees for illusory benefits. In support of their cause of action for violation of the DCCPA, plaintiffs further allege that Second Nature deceived them by misrepresenting the benefits and the value supposedly provided by the package, including falsely representing the nature of the insurance provided. Such allegations fall squarely within the purview of Exclusion 1.

**C. Other terms and conditions may apply to bar or limit coverage.**

The absence of any allegations of negligence against Second Nature and the applicability of Exclusion 1 are each separately and independently fully dispositive of coverage under the Policy the *Best* action. However, please be advised that other terms and conditions in the Policy may apply as well to bar or limit coverage for the **claim**. Without intending to be exhaustive or exclusive, Accelerant takes this opportunity to briefly identify certain of these provisions on which it expressly reserves rights.

- **Excluded Costs and Damages.** Under the Policy, there is no coverage for any **claim** to the extent it seeks or includes, among other things: fines and penalties; return or restitution of charges for goods or services provided or rendered; liquidated or multiple damages; restitution or disgorgement of unjust enrichment or profits to which an **insured** is not legally entitled; and the

[2] To be sure, however, the complaint also includes allegations of conduct concerning services that do not constitute **professional services** within the meaning of the Policy, including "selling insurance without a license."

costs of complying with injunctive relief. *See* Policy, Section VI.B.9. In this regard, Accelerant points out that the complaint seeks relief that may fall within this exclusion, including treble damages.

- **Failure to Maintain Insurance.** The Policy excludes from coverage any **claim** based upon or arising out of any actual or alleged failure to procure or maintain adequate insurance. *See* Policy, Section VI.B.12. Because the complaint alleges that the insurance procured through Second Nature was inadequate, this exclusion may apply to bar coverage for the *Best* action.

- **Prior Acts.** Exclusion 23 bars coverage for any **claim** based upon or arising out of any actual or alleged conduct that was committed prior to the **retroactive date**. *See* Policy, Section VI.B.23.a. As set forth in Item 5 of the Declarations, the **retroactive date** is May 2, 2023. While the complaint does not specifically point to any wrongdoing the pre-dates May 2, 2023, the allegations do suggest that some of the acts complained of likely occurred before that date. In this regard, the particular lease at issue here commenced on June 1, 2023 – presumably, Second Nature's alleged wrongdoing in connection with developing and marketing the purported fraudulent scheme involving the resident benefits package occurred at least a month earlier than the start of that lease.

**III. Conclusion**

Accelerant has determined that the Policy does not afford any coverage here, and therefore that it has no defense-related or indemnity obligations to Second Nature or any other party in connection with the *Best* action. This conclusion is based on the information provided to Accelerant so far. Should you believe that there is other information that Accelerant should consider and that may warrant reconsideration of its coverage position, Accelerant invites you to provide that information to us. Also, at any point, should you have any questions or wish to discuss the matter further, please do not hesitate to reach out.

In the interim, and pending further information and developments in the litigation, Accelerant continues to reserve all of its rights under the Policy, at law and in equity. These rights include but are not limited to the right to rely on other terms, conditions and limitations in the Policy that may be implicated.

Sincerely,

Marc E. Rindner
Andrew G. Lipton

cc: Tim de Koekkoek (tdekoekkoek@premierclaimsllc.com)
Rob MacKethan (mackethan@secondnature.com)

# Exhibit 4

ROBINSON
BRADSHAW

August 30, 2024

SDeGeorge@robinsonbradshaw.com
704.377.8380 : Direct Phone

**(By Email)**

Marc E. Ridner, Esq.
Andrew G. Lipton, Esq.
Lavin Ridner Duffield LLC
3811 Frederica Road, Suite 201
Saint Simons Island, GA 31522
Email: mridner@lrd.law
Email: alipton@lrd.law

Re: Second Nature Brands, Inc./Policy No. S0004PL00191000/Claim No. 28-023880

Dear Messrs. Ridner and Lipton:

Our firm represents Second Nature Brands, Inc. ("Second Nature"). I write in response to your letter dated July 8, 2024. Therein, you stated the position of Accelerant Specialty Insurance Company ("Accelerant") regarding obligations under the referenced policy (the "Policy") for the lawsuit captioned *Best, et al. v. Second Nature Brands, Inc., et al.*, United States District Court, District of Columbia, Case No. 1:2024-cv-01799 (the "Lawsuit"). Second Nature disagrees with Accelerant's position, particularly the denial of its duty to defend. Second Nature respectfully requests that Accelerant reconsider and acknowledge its duty to defend the Lawsuit, even if the acknowledgement is subject to a reservation of rights.

Before turning to the grounds on which Accelerant relies, we note for context the principle under governing North Carolina law that an insurer's duty to defend is triggered where any allegation in a complaint, construed liberally, creates a "mere possibility" that the conduct alleged falls within a policy's coverage for any claim asserted. *Arch Specialty Ins. Co. v. Ferster Elec., LLC,* 2024 WL 1724773 at *4 (E.D.N.C. Apr. 22, 2024), *quoting Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691 n. 2, 340 S.E.2d 374, 377 n.2 (1986). "Any doubts must be resolved in favor of the insured." *Certain Underwriters at Lloyd's, London v. Stock Building Supply, LLC,* 556 F.Supp.3d 559, 565 (E.D.N.C. 2021) (citation omitted). An insurer that denies its duty to defend under this liberal standard does so "at its own peril." *Imperial Cas. and Indem. Co. v. Radiator Specialty Co.,* 862 F.Supp. 1437, 1441 (E.D.N.C. 1994) (citation omitted). The consequences are harsh. "If it is later determined that the insurer breached its duty to defend, 'the insurer is estopped from denying coverage . . .'" *National Union Fire Ins. Co. of Pittsburgh, PA v. Intercoastal Diving, Inc.*, 2012 WL 1978291 at *3 (E.D.N.C. June 1, 2012), *quoting Pulte Home Corp. v. Am. Southern Ins. Co.*, 185 N.C.App. 162, 165, 647 S.E.2d 614, 617 (2007).

Accelerant acknowledges the Lawsuit constitutes a "claim" pertaining to "professional services" as these terms are used in the Policy. Accelerant nonetheless denies any obligation on two grounds. First, Accelerant asserts the Complaint is not based on any alleged "negligent act, error or omission." Second, Accelerant relies on Exclusion 1, which applies to claims of "false, deceptive or unfair trade practices, . . . or . . . deceptive or misleading advertising."

Count I in the Complaint alleges that Second Nature, both directly and indirectly though the alleged acts and omissions of the other defendants, violated D.C. Code § 42-3502.11a.[1] This Code provision prohibits imposition of a mandatory fee for a service or facility without first obtaining approval pursuant to one of two other Code provision, §§ 42-3502.11 or 42-3502.15. Section 42-3502.11 allows the Rent Administrator to allow increased rent in proportion to an increase in the value of services or facilities. Section 42-3502.15 allows the Rent Administrator to approve a rent increase where the housing provider files with the Rent Administrator certain documents and information showing that a specified percentage of the tenants agreed to the proposed increase. Intentional conduct is not necessary to violate § 42-3502.11a, § 42-3502.11 or § 42-3502.15.

The alleged predicate acts and omissions underlying Second Nature's alleged failure to comply with § 42-3502.11a include assorted misrepresentations, failures to fulfill prescribed regulatory requirements, and failures to provide tenants certain information and documents. Because intentional wrongdoing is unnecessary, the alleged predicate acts underlying the alleged violation of § 42-3502.11a may consist, partially or entirely, of negligent acts or omissions. Indeed, "negligence" means an "inadvertent" act or omission "in the discharge of a legal duty." *Negligence, Black's Law Dictionary*, (11th ed. 2019). "Negligence" encompasses a spectrum of conduct ranging from simple negligence under the reasonable person paradigm to "gross negligence" and "recklessness." Notable here is the principle that an alleged "negligent misrepresentation" is actionable under District of Columbia law. *E.g., Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 555 (D.C. App. 2016). Accelerant selected the term "negligent" and chose not to include it in the long list of terms defined in the Policy, so it must be construed broadly to maximize coverage.[2] Therefore, the plaintiffs may prevail on Count I based on, in the words of the Policy, "a negligent act, error, or omission." This, standing alone, triggers Accelerant's duty to defend.

Even if all of Second Nature's alleged conduct falls outside Accelerant's indemnity obligation for "negligent" acts, errors or omissions (which it does not), the Policy still requires Accelerant to pay Second Nature's "claim expenses."[3] Section VI.B.15 of the Policy addresses allegations of "alleged fraud, dishonesty, criminal conduct, or any knowingly wrongful, malicious, or intentional acts or omissions." Where a claim is based on such alleged conduct, § VI.B.15 requires Accelerant to "pay **claim expenses** until there is a final adjudication establishing such conduct, . . . " This independently defeats Accelerant's denial of its duty to defend.

---

[1] This letter focuses on Count I of the Complaint, because a duty to defend any claim obligates Accelerant to defend all claims. *E.g., Universal Underwriters Ins. Co. v. Lallier*, 334 F.Supp.3d 723, 734 (E.D.N.C. 2018) (citation omitted). We believe Count II likewise triggers Accelerant's duty to defend. We will explain Accelerant's duty to defend Count II, if you wish, but that should not delay acknowledgement of the duty to defend Count I and, therefore, the entire Lawsuit.

[2] Any ambiguity regarding the meaning of "negligent" as applied to Accelerant's duty to defend the Lawsuit must be resolved in favor of Second Nature, and against Accelerant. *Arch*, 2024 WL 1724773 at *5.

[3] The Policy defines "claim expenses" broadly to include "all reasonable and necessary fees, costs, and expenses (including fees of attorneys and experts) incurred in the investigation, defense, or appeal of a **claim**."

Based on the foregoing, Second Nature respectfully requests that Accelerant acknowledge its duty to defend the Lawsuit. Upon acknowledgement, Second Nature will provide invoices for past claim expenses, and cooperate with Accelerant in transitioning future invoices in accordance with Accelerant's instructions. If Accelerant reserves its right to deny an indemnity obligation under the Policy, we will consider whether the reservation creates a conflict entitling Second Nature to independent counsel to be paid by Accelerant.

This letter identifies reasons why Accelerant has the duty to defend the Lawsuit. It is not intended as an exhaustive statement of Second Nature's rights under the Policy, and otherwise. Second Nature reserves all such rights.

We look forward to your prompt and favorable reply.

Sincerely,

ROBINSON, BRADSHAW & HINSON, P.A.

R. Steven DeGeorge

# Exhibit 5

LRD
LAVIN RINDNER DUFFIELD LLC

Marc E. Rindner
912.266.8302
mrindner@lrd.law

Andrew G. Lipton
912.266.8306
alipton@lrd.law

**VIA EMAIL**

September 25, 2024

R. Steven DeGeorge
Robinson, Bradshaw & Hinson, P.A.
101 N. Tyron Street – Suite 1900
Charlotte, NC 28246
E: sdegeorge@robinsonbradshaw.com

| | | |
|---|---|---|
| Re: Insurer: | Accelerant Specialty Insurance Company ("Accelerant") |
| Insured: | Second Nature Brands, Inc. ("Second Nature") |
| Policy No.: | S0004PL00191000 (the "Policy") |
| Matter: | *Elizabeth Best, et al. v. Second Nature Brands, Inc. et al.*, Case No. 1:24-cv-01799 (D.D.C.) (the "*Best* action") |
| Claim No.: | 28-023880 |

Dear Steve:

We write in response to your letter dated August 30, 2024, in which Second Nature disputes Accelerant's determination set forth in our July 8, 2024 letter that the Policy does not afford any coverage for the *Best* action. Accelerant initially evaluated coverage based on the allegations asserted in plaintiffs' complaint filed on April 29, 2024. Plaintiffs filed a first amended complaint on September 13, 2024 (the "FAC"). In considering the arguments made and the points raised in your letter, Accelerant also has considered the allegations asserted in the FAC, which largely mirror those asserted in plaintiffs' prior pleading. Overall, Accelerant has determined that its initial conclusion was and remains correct: the Policy does not afford any coverage to Second Nature for the *Best* action.

**A. In the absence of any allegation of a "negligent act, error or omission," the *Best* action does not trigger coverage.**

Under the Policy's sole insuring agreement, coverage is limited to a **claim** against an **insured** "alleging a negligent act, error or omission" in the performance of **professional services**. *See* Policy, Section II. Here, however, there are no allegations in the *Best* action of any negligent conduct by Second Nature – the word "negligent" (or any derivation of it) does not even appear in the pleadings. Rather, all the alleged wrongdoing asserted in the FAC is of knowing and intentional misconduct.

Plaintiffs' claims for relief in the *Best* action rest entirely on allegations of a "fraudulent scheme . . . set up by . . . Second Nature" to enable "landlords and property managers to bilk residential tenants . . . out of money." In this regard, the FAC details how Second Nature allegedly "conspire[ed]" with and "aid[ed] and abet[ed]" the other defendants to "charge a mandatory fee in violation of D.C. Code § 42-3502.11a" and otherwise engage in "consumer fraud." As the Supreme Court of North Carolina has recognized, "actionable fraud by its very nature involves intentional wrongdoing." *See Newton v. Standard Fire Ins. Co.*, 229 S.E.2d 297, 302 (N.C. 1976) (citing *Davis v. Highway Commission*, 156 S.E.2d 685, 688 (N.C. 1967)

("[f]raud is malfeasance, a positive act resulting from a willful intent to deceive")). Moreover, "[p]hrases such as 'mislead and conceal,' 'scheme or device' and 'intentionally and willfully' are the paradigm of intentional conduct and the antithesis of negligent actions." *See Conn. Indem. Co. v. DER Travel Service, Inc.*, 328 F.3d 347, 351 (7th Cir. 2003); *see also Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 696 ("the terms 'device,' 'scheme,' and artifice all connote knowing or intentional practices").

In your August 30 letter, Second Nature does not dispute the fact that there is not even a hint of negligent conduct alleged in the *Best* action. Instead, focusing only on the first cause of action, Second Nature argues that coverage is triggered nonetheless because a showing of intentional conduct is not necessary to establish a violation of D.C. Code § 42-3502.11a. In other words, according to Second Nature, coverage is triggered because "the alleged predicate acts underlying the alleged violation of [the statute] *may* consist, partially or entirely, of negligent acts or omissions." (Emphasis added.) This argument misses the mark.

North Carolina courts follow the "comparison test" to determine if coverage is triggered, and therefore the duty to defend. *See St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 239 (4th Cir. 1990). Whether coverage is triggered is determined by:

> the facts as alleged in the pleading of the lawsuit against the insured; if the pleadings allege any facts which disclose a possibility that the insured's potential liability is covered under the policy, then the insurer has a duty to defend. If, however, the facts alleged in the pleadings are not even arguably covered by the policy, then no duty to defend exists.

*Wm. C. Vick Const. Co. v. Penn. Nat. Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569, 578 (E.D.N.C. 1999) (citations omitted); *see Vigilant*, 919 F.2d at 239 (under North Carolina's 'comparison test' . . . the pleadings are read side-by-side with the policy to determine whether the event as alleged are covered or excluded"); *see also Am. Reliable Ins. Co. v. Five Bros. Mortgage Co. and Securing, Inc.*, 306 F. Supp. 3d 820, 824 (W.D.N.C. 2018) ("[i]n North Carolina, the pleadings control the duty to defend") (citing *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986) (the duty to defend requires that "pleadings state facts demonstrating that the alleged injury is covered by the policy")). It is the facts *as alleged* that matter, and not what *may have been* or *could be alleged*. *See Hartford Cas. Ins. Co. v. Gelshenen*, 387 F. Supp. 3d 634, 638 (W.D.N.C. 2019) ("The court's analysis of the facts are limited to those alleged in the underlying pleading, not any and every version of the facts."); *see also Kenney Properties, Inc. v. Phila. Indem. Ins. Co.*, 665 F. Supp. 3d 752, 761 (E.D.N.C. 2022) ("[i]n addressing the duty to defend, the question is not whether some interpretation of the facts as alleged could possibly bring the injury within the coverage provided by the insurance policy; the question is assuming the facts as alleged to be true, whether the insurance policy covers the injury") (citing cases); *Five Bros.*, 306 F. Supp. 3d at 824 ("the duty to defend relies on the factual allegations of the complaint"). To suggest otherwise, and not rely on the actual pleading but rather some hypothetical version of it, is entirely inconsistent with the application of the "comparison test."

Applying that test here, because there are no allegations of negligence on the part of Second Nature, including in the currently operative FAC, coverage is not triggered and no duty to defend exists.[1]

**B. Exclusion 15 does not operate to create coverage that does not otherwise exist under the Policy's insuring agreement.**

In your letter, Second Nature asserts Exclusion 15 requires Accelerant to pay **claims expenses** until there is a final adjudication establishing the fraudulent conduct alleged in the *Best* action. This argument ignores the well-settled principle that the examination of coverage begins with the insuring agreement and if coverage cannot be found there, it will not be found elsewhere in the policy. *See Five Bros.*, 306 F. Supp. 3d at 824-26 (discussing that the insured first must "bring[] itself within language of the policy," and recognizing that where the insured has failed to do so, it is "unnecessary" to address other provisions in the policy, including whether an exclusion applies). And, consistent with this principle, courts across the country have held that "an exception to an exclusion does not grant or extend coverage" that does not otherwise exist in the insuring agreement. *See Travelers Indem. Co. of Am. v. Miller Bldg. Corp.*, 142 F. App'x. 147, 150 (4th Cir. 2005) (applying Virginia law); *Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 112 (5th Cir. 2008) (holding that under Texas law, an exclusion cannot be the basis to create coverage that does not otherwise exist in the policy); *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 627 (9th Cir. 1996) (applying California law) ("If coverage does not exist under the insuring agreement, the inquiry is at an end. There is no need to look to the exclusions because they cannot expand the basic coverage granted in the insuring agreement."); *Women's Integrated Network, Inc. v. U.S. Specialty Ins. Co.*, 2012 WL 13070116, *8 (S.D.N.Y. Oct. 26, 2012) (recognizing that under New York law, "[i]t is well settled that 'an exclusion from insurance coverage cannot create coverage' . . . [and that] [a]n exception to an exclusion is not the equivalent to an affirmative grant of coverage"); *Exec. Risk Indem. Inc. v. Chartered Benefit Servs., Inc.*, 2004 WL 1838433, *8 (N.D. Ill. July 28, 2005) ("It is axiomatic that exclusions can only decrease coverage, they cannot increase it.") (citing *Cont'l Cas. Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 300 (7th Cir. 1990)); *Another Planet Entertainment, LLC v. Vigilant Ins. Co.*, 548 P.2d 303, 327 (Cal. 2024) ("If a grant of coverage cannot reasonably be read to include a matter, . . . the language of [an] exclusion cannot create coverage where none exists.").

As discussed above and in our July 8 letter, the Policy's insuring agreement requires a negligent act, error or omission to trigger coverage. In the absence of any allegation of such conduct, there is no coverage in the first place for the *Best* action. Exclusion 15 cannot change this, and therefore the defense component of that exclusion is not implicated.

---

[1] While not dispositive, it bears mentioning that the notion that plaintiffs *may* allege negligence in connection with Second Nature's purported violation of D.C. Code § 42-3502.11a is belied by the fact that in amending their pleadings, plaintiffs point to as "as further evidence of [Second Nature's] knowing violation of law" that after the lawsuit was filed, Second Nature "purg[ed] evidence [of] and . . . camouflage[d] the 'residents benefits package'" on their website.

**C. Exclusion 1 precludes coverage for the entirety of the *Best* action.**

Notwithstanding the caveats in footnote 1 of your letter, by focusing solely on the first cause of action, Second Nature appears to concede the applicability of Exclusion 1 to the second cause of action – that is, the cause of action for unfair trade practices in violation of the District of Columbia Consumer Protection Procedures Act (the "DCCPPA"). To be sure, however, the exclusion applies to the entirety of the **claim**.

Exclusion 1 provides that there is no coverage available under the Policy for any **claim**:

> [b]ased upon or arising out of any actual or alleged . . . false, deceptive or unfair trade practices, . . . or deceptive or misleading advertising.

*See* Policy, Section VI.B.1. The language of the exclusion is clear and unambiguous, and therefore must be enforced as written. *See Fed. Ins. Co. v. Southern Lithoplate, Inc.*, 7 F. Supp. 3d 579, 584 (E.D.N.C. 2014); *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield LLC*, 692. S.E.2d 605, 610 (N.C. 2010); *see also Westfield Ins. Co. v. Nautilus Ins. Co.*, 154 F. Supp. 3d 259, 265 (M.D.N.C. 2016) ("Although the duty to defend is broad, it is not limitless; rather, its scope is measured by the insurance contract between the parties."). Moreover, "[i]n determining whether there is a duty to defend, a court focuses on the facts pled and not on how the litigants characterize the claims." *See Kenney Properties*, 665 F. Supp. 3d at 761 (citing *Holz-Her U.S., Inc. v. U.S. Fid. & Guar. Co.*, 539 S.E.2d 348, 350 (N.C. App. 2000)).

Here, while the first cause of action may be characterized by plaintiffs as a claim for a violation of the D.C. Code § 42-3502.11a, which prohibits a housing provider from imposing on a tenant certain mandatory fees, it rests on allegations of conduct that constitute "false, deceptive or unfair trade practices" and "deceptive or misleading advertising." As noted above, and as articulated in the section in the FAC titled "Facts Common to All Counts," plaintiffs allege that Second Nature developed and implemented a fraudulent scheme that enabled landlords and property managers to bilk residential tenants out of money. The FAC further alleges that this scheme was effectuated by, among other things, falsely representing to the tenants the purported benefits of the "resident benefits package," and giving the tenants no choice but to accept the package. Plaintiffs contend that defendants' actions in this regard, including those of Second Nature, while constituting fraud, also amount to the unlawful imposition of a mandatory fee.

Because Second Nature's purported violation – directly or as co-conspirator or aider and abettor – of D.C. Code § 42-3502.11a is based upon or arises out of conduct that constitutes false, deceptive or unfair trade practices or false or misleading advertising, Exclusion 1 applies to bar coverage. And to be sure, the same is true as to the allegations supporting plaintiffs' cause of action for unfair trade practices under the DCCPPA. In other words, the exclusion bars coverage for the **claim** as a whole – that is, the *Best* action.

* * * *

Accelerant remains of the view that the Policy does not afford any coverage here, and therefore that it has no defense or indemnity obligations to Second Nature or any other party in connection with the *Best* action. This conclusion is based on the information provided to Accelerant so far. Should you believe that

there is other information that Accelerant should consider and that may warrant further reconsideration of its coverage position, Accelerant invites you to provide that information to us.

In the interim, and pending additional information and developments in the litigation, Accelerant continues to reserve all of its rights under the Policy, at law and in equity. These rights include but are not limited to those set forth in our July 8 letter, as well as the right to rely on other terms, conditions and limitations in the Policy that may be implicated.

Sincerely,

Marc E. Rindner
Andrew G. Lipton

cc: Tim de Koekkoek (tdekoekkoek@premierclaimsllc.com)
Charlita Joseph (charlita.joseph@marshmma.com)